**CHARLES TOWN, INCORPORATED,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 10645.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 6, 1966.

Decided Jan. 31, 1967.

George T. Altman, Beverly Hills, Cal. (Stanley H. Wilen, Baltimore, Md., on brief), for petitioner.

Albert J. Beveridge, III, Attorney, Department of Justice (Richard C. Pugh, Acting Asst. Atty. Gen., Lee A. Jackson and Gilbert E. Andrews, Attorneys, Department of Justice, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BRYAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

The Tax Court sustained the action of the Commissioner of Internal Revenue in redistributing income for fiscal years ending November 30, 1958, and 1959, from Fairmount Steel Corporation to Charles Town, Incorporated, under Sections 61 and 482 of the Internal Revenue Code of 1954.[1] The Commissioner's allocation under Section 482 is predicated on the alleged shifting of profits from one controlled entity (Charles Town) to another (Fairmount) for the purpose of utilizing net operating loss carryovers of the latter. Charles Town has petitioned this court under 26 U.S.C.A. Section 7482 to review and reverse the decision of the Tax Court. The facts are related in exhaustive detail in the opinion of the Tax Court.[2]

Fairmount was admittedly controlled at all relevant times by two brothers, Ben and Herman Cohen. Fairmount had allowable net operating loss carryovers from its taxable years ended June 30, 1955, 1956, and 1957, in the amount of $852,105.37.

The Cohens also controlled other business enterprises including Housing Engineering Corporation and C.B. Associates, a partnership which succeeded Housing Engineering upon its liquidation in April 1958. Housing advanced on March 28, 1958, $900,000.00 to Fairmount which ultimately enabled Fairmount to make available a like amount to Charles Town. The advance to Fairmount was not evidenced by any debt instrument, did not bear interest, was made without security, and carried no

1. The Commissioner's "Explanation of Adjustments" which accompanied his notice to Charles Town of the determination of a tax deficiency for the years in question stated that the income reported by Fairmount "constituted additional income to * * * (Charles Town) under the provisions of Section 61 and Section 482 of the Internal Revenue Code of 1954 * * *."

Section 61 reads in part:
"§ 61. Gross Income defined
"(a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
"(1) Compensation for services, including fees, commissions, and similar items;
"(2) Gross income derived from business * * *."

Section 482 reads:
"§ 482. Allocation of income and deductions among taxpayers.

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

2. The Memorandum Findings of Fact and Opinion of the Tax Court is reported at P–H Tax Ct. Mem. ¶ 66,015 (January 19, 1966). The findings of fact as reprinted in the petitioner's appendix run to thirty pages.

date for repayment. It was reflected on Housing's books as a debit to "Accounts Receivable" and on Fairmount's books as a credit to "Loans Payable #1." The advance eventually was returned in various forms to C.B. Associates with an initial payment being made by Fairmount on March 26, 1959.

Ben Cohen had evinced interest in acquiring the Charles Town Race Course (hereinafter referred to as the Race Course) in Charles Town, West Virginia, since the late 1930's. The opportunity finally came in 1958 when the widow of the former owner, under threat of State franchise revocation, deemed it advisable to carry on serious negotiations.

Ben Cohen was the primary negotiator on behalf of himself and his brother in their individual capacities. Ben Cohen had not determined whether a sale, if consummated, would be to "any particular corporation or individual" and, specifically, did not inform the prospective seller that he was acting in the negotiations for Fairmount.

The Cohens were unable to negotiate a purchase, but a lease of the Race Course was executed May 20, 1958, with *"Ben Cohen, acting for Charles Town, Incorporated,* a corporation to be hereinafter [sic] created * * * as the Lessee."* (Emphasis added.) The initial lease covered the period between May 22 and September 10, 1958.

Concurrently with the execution of the lease on May 20, 1958, an agreement was entered into between Fairmount and Charles Town under which the former agreed to provide the necessary funds for conducting the contemplated racing meet and the latter agreed to operate it for the benefit of former in exchange for ten percent of the net profits. The agreement [3] provided that the directors and officers of Charles Town would be Ben and Herman Cohen and Louis Pondfield, a first cousin and business associate of the Cohens with experience in managing racing events. The agreement

also provided that the majority of the officers should make all major decisions in the management of the racing meet "so long as Charles Town shall be indebted to Fairmount * * *."

A Certificate of Incorporation was formally issued by West Virginia to Charles Town on May 22, 1958. The main object of the corporation was to "engage in and carry on the business of operating a race track * * *." Its principal office was listed as the Baltimore address of the Cohen brothers. One hundred shares of Charles Town stock were issued. Ninety-eight were in the name of Louis Pondfield and one each in the names of Ben and Herman Cohen.

Charles Town assumed its obligations under the lease and the agreement with Fairmount and adopted bylaws providing that its board of directors would control and manage the corporation. Ben Cohen, Herman Cohen, and Louis Pondfield were elected directors and constituted the full board of directors until May 15, 1961. They also served during this time as president, secretary-treasurer, and vice-president respectively.

Following subsequent negotiations conducted by Ben Cohen on behalf of Charles Town, a second lease was executed on November 3, 1958, granting Charles Town use of the Race Course for the period of November 20, 1958, through February 20, 1959. The second lease was similar in all pertinent respects to the original lease. A second identical agreement was entered into with Fairmount providing for the financing of a winter racing meet during the term of the new lease.

In the course of the period with which we are concerned, running until the close of Charles Town's fiscal year on November 30, 1959, Fairmount made payments to and on behalf of Charles Town, pursuant to its two agreements, in the aggregate amount of $986,525.00. These included funds for rent of the Race Course, opening balances in Charles Town's various bank accounts, and the "bankroll"

---

3. The agreement in full is included in the opinion of the Tax Court.

necessary to commence wagering operations. These advances were credited on Charles Town's books to an account styled "Account Payable—Fairmount Steel Corporation," with the exception of $20,000.00 which was credited to an account entitled "Advances from Fairmount Steel Corporation." The advances were debited on Fairmount's books to an account termed simply "Charles Town, Inc."

The income and expenses with respect to the two racing meets were reflected on the books of Charles Town. However, by a journal entry all the income and expense, with the exception of officers' salaries, were transferred to the books of Fairmount, and a second journal entry was used to allocate ten percent of the net profits to Charles Town. The entries were made on June 30, 1958, covering transactions to that date, which was the end of Fairmount's fiscal year; in November 1958, covering the remainder of the first racing meet; and in the spring of 1959, covering the second racing meet.

Fairmount reported on its federal income tax returns the gross receipts and all the expenses in connection with the operation of the two racing meets and claimed a deduction for commission expense representing the ten percent of the net profits allocated to Charles Town. Fairmount's return for its fiscal year ended June 30, 1959, showed a net profit of $732,299.86 from the racing meets, but because of its allowable net operating loss carryover, it paid no federal income tax on this amount.

On its federal tax returns for the periods in question Charles Town reported gross receipts representing ten percent of the net profits from the racing meets. Charles Town claimed deductions for the compensation paid its officers and for small contributions to the Herman and Ben Cohen Charitable Foundation.

Although Charles Town now contends it was engaged in a joint venture with Fairmount, no partnership returns were filed with the Internal Revenue Service

reflecting any of the income or expenses from either of the racing meets.

Charles Town *Properties,* which had been incorporated on April 19, 1958, consummated a contract for the purchase of the Race Course on May 7, 1959. Ninety percent of the stock in Charles Town Properties was acquired by the Cohen interests and since May 19, 1959, the Cohen brothers have constituted its principal officers and a majority of its board of directors.

Fairmount was liquidated on June 1, 1962. Charles Town, Incorporated, has been dormant since the spring of 1959—having conducted no business other than the two racing meets under consideration here.

The Commissioner, acting pursuant to Sections 61 and 482 of the Internal Revenue Code, allocated additional income to Charles Town of $732,299.86, representing the ninety percent of the profits from the racing meets which had been reported by Fairmount. A deficiency, as a result, was assessed against Charles Town for the fiscal year ended November 30, 1958, of $258,616.93 and for the year ended November 30, 1959, of $117,367.57.

The Tax Court, in sustaining the Commissioner, found as ultimate facts that Charles Town was organized for the purpose of conducting the two racing meets *in its own right;* that it performed substantial income-producing activities; and that it produced or earned the total net income from the racing meets. In addition, the Tax Court found that the Commissioner, in allocating the income reported by Fairmount to Charles Town, did not act unreasonably, arbitrarily, or capriciously, and that the allocation was necessary in order to prevent the evasion of taxes and to clearly reflect the taxable income of Charles Town within the meaning of Section 482 of the Internal Revenue Code. The Tax Court concluded that "no serious question can arise as to control of both Fairmount and Charles Town by the Cohen brothers" as *control* is used in Section 482. It also found that the advances to Charles Town by Fair-

mount were in substance equity investments.

Section 482 of the Internal Revenue Code authorizes in any case where two businesses are controlled *directly* or *indirectly* by the same interest an allocation of gross income and deductions between them if it is determined that this is necessary to prevent tax evasion or clearly to reflect the income of either business. The purpose of this provision "is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Treas.Reg. § 1.482–1(b); see, e. g., Aiken Drive-In Theatre Corp. v. United States, 281 F.2d 7, 9–10 (4th Cir. 1960). The legislative history of Section 482 indicates it was "designed to prevent the avoidance of tax or the distortion of income by the shifting of profits from one business to another." Rooney v. United States, 305 F.2d 681, 683 (9th Cir. 1962).[4]

Charles Town contends that there was not on the present facts sufficient control of both it and Fairmount by the "same interests" to justify the Commissioner's application of Section 482. Charles Town's position is that "section 482 applied only to transactions between *already* controlled taxpayers" and that control by the Cohens of Charles Town was effected by and wholly dependent on the intercorporate agreements of May 20 and November 3, 1958, which are themselves the transactions which governed the original distribution of income challenged by the Commissioner. It is true that common "[c]ontrol or ownership must exist when the taxpayers deal with each other." Rooney v. United States, 305 F.2d 681, 683 (9th Cir. 1962).

The question of control is one of fact which was determined adversely to Charles Town by the Commissioner and in the Tax Court. The Tax Court's finding may not be reversed unless it is "clearly erroneous." See Int.Rev.Code of 1954, § 7482, Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Hall v. Commissioner of Internal Revenue, 294 F.2d 82, 85 (5th Cir. 1951). By the very terms of Section 482 control can be either *direct* or *indirect*. The regulations promulgated under Section 482 define control to include "any kind of control * * * whether legally enforceable, and however exercisable or exercised. It is the reality of control which is decisive, not its form or the mode of its exercise." Treas.Reg. § 1.482–1(a) (3).

We cannot say that the Tax Court was clearly in error when it determined there was sufficient control of Charles Town and Fairmount by the same interests (the Cohens) to permit the Commissioner's application of Section 482. We agree with the Tax Court that the control exercised by the Cohens by reason of the intercorporate agreements between Charles Town and Fairmount "was only one of several facts * * * by which their actual and effective control of the corporation was acquired and exercised."

---

4. Section 1.482–1(c) of the Treasury Regulations under the Internal Revenue Code of 1954 provides:

"Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer."

The Cohens, of course, retained control of Charles Town until May 1961 by reason of their election to positions as directors and officers which occurred upon organization of the corporation. However, they also controlled the negotiations and entire course of events which led to the creation of Charles Town, the acquisition of the lease for the Race Course, and the execution of the agreement between Fairmount and Charles Town assuring essential capital for the new corporation and their *continued* control of the business venture. The Cohens caused the actual incorporation of Charles Town, as shown vividly by the incorporating attorney's testimony that it was the Cohens "at * * * whose request * * * [he] set up this corporation." The documents relating to the incorporation were, in fact, forwarded to the offices of the Cohens in Baltimore where Charles Town's books and records were maintained.

■ Notwithstanding the ownership by Louis Pondfield of ninety-eight percent of the outstanding shares of Charles Town upon incorporation, the Tax Court was justified in concluding that the Cohen brothers were at all times in effective "control" of the *business* known as Charles Town, Incorporated. Pondfield gave up the control he could have exercised as majority stockholder when he permitted Charles Town to contract that the Cohen brothers could not be removed from majority control of the Charles Town Board of Directors until the money advanced by Fairmount was returned. This was "the reality of control."

The Tax Court concluded, after making a thorough examination of the relationship between Charles Town and Fairmount and relying on National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), that though in form the intercorporate agreements here purport to constitute Charles Town an agent of Fairmount for conducting the racing meets in question, no agency for tax purposes was established. Counsel for Charles Town now agrees that an agency relationship was not created,[5] but continues to maintain that the racing meets were conducted as a joint venture to which Fairmount contributed capital and Charles Town undertook management with the income to be divided as provided in the intercorporate agreements. The Tax Court found, however, that there was in fact no joint venture but that "Charles Town earned the income in question."

■ The determination of whether the income was earned by Fairmount and Charles Town participating in a joint venture or by Charles Town itself "is, at least, primarily, the determination of a question of fact, and, in order for this court to reverse the finding of the Tax Court, it must be shown that the finding is clearly erroneous." Ballentine Motor Co. v. Commissioner of Internal Revenue, 321 F.2d 796, 798 (4th Cir. 1963). After carefully reviewing the record, we believe the Tax Court was justified in finding that the racing meets were conducted and the income from them earned by Charles Town in its own right.[6]

Charles Town was itself the party to the lease of the Race Course which was the source of the income, and in fact sued the lessor in its own name for an alleged overpayment of rent. Charles Town obtained in its name the licenses to conduct the meets from the West Virginia Racing Commission, and represented in supporting statements that it was the appli-

5. The concession was twice made in oral argument before this court.

6. As was noted above, the Tax Court found that the advances to Charles Town were in substance contributions to capital by Fairmount. Thus, the payment of ninety percent of the net income from the racing meets to Fairmount would to the extent it exceeded Fairmount's advances be characterized as dividends, and would be subject, presumably, to the intercorporate dividend deduction provided in Int.Rev. Code of 1954, § 243. It has never been contended by Charles Town that the advances by Fairmount were intended as loans.

cant, that the Race Course was to be conducted by the corporation under the name of Charles Town, Incorporated, and that Fairmount had "advanced by loan, or otherwise, the capital invested in the business." Charles Town maintained four separate bank accounts in its name and its own books of account which reflected all transactions in respect to the meets. Charles Town itself hired the substantial number of employees necessary to operate the Race Course, and paid to them more than $630,000.00 in wages over the period of the two racing meets.[7]

Charles Town also entered into in its own name numerous contracts for materials and services required to conduct the racing meets. Charles Town acquired membership in and paid assessments to the Thoroughbred Racing Association of the United States whose by-laws provide that members shall consist of the thoroughbred racing associations duly organized and conducting business. Charles Town elected to participate in the West Virginia Workmen's Compensation Plan and filed various state and federal tax information forms.

Thus, the facts may be viewed as supporting the conclusion of the Tax Court that the "business purpose of Charles Town was the operation of the track in its own right" and that it did "all things necessary to earn the income in question" by operating the two racing meets.

The present position of Charles Town that it was a party to a joint venture with Fairmount in which Fairmount contributed the capital and Charles Town the management services does not find convincing support in the record. The reasoning of the Tax Court on this question is persuasive. The Tax Court noted

"that is not the way the contract between them was drawn. The agreement was that Charles Town was to operate the race track 'for the benefit of Fairmount' except that 'Charles Town shall receive 10 per cent (10%) of the profits for its services.' This is not the language of a joint venture. The parties did not hold themselves out to the public as joint venturers. * * * The fact that the parties treated the income returned by Charles Town as 'commissions' is further indicative that the parties were not joint venturers. Under West Virginia case law, a joint venturer is considered to be a limited partner. Horchler v. Van Zandt, 120 W.Va. 452, 199 S.E. 65 (S. Ct.App.1938). No partnership returns were filed. The only returns that were filed were those of Fairmount and Charles Town as separate corporations."

In addition, it was important for the Cohens and Fairmount to have the racing meets conducted by a corporate entity as opposed to having Fairmount enter into a joint venture in order to limit Fairmount's liability to the advances actually made to Charles Town. The Tax Court specifically found that "one of the purposes of forming Charles Town was to limit liability for possible claims for personal injuries and other liability that could arise out of the operation of the meet." When the lease was executed for the Race Course "over 100 improvements were required by the insurance company as a condition of writing the policy. * * * Despite such improvements there was still danger of claims in excess of the insurance coverage."

Charles Town contends that the clauses in the intercorporate agreements with Fairmount providing that "if the result of the operation shall result in a loss, such loss shall be borne by Fairmount * * *" and that "any loss shall be borne entirely by Fairmount" obviates in any case the ordinary protective attribute afforded by the corporate form. We do not agree with Fairmount's interpretation of these clauses. We believe they were inserted to prevent Fairmount

---

7. In its initial statement for the West Virginia Department of Employment Security, Charles Town indicated employment of over three hundred and fifty employees during a typical week for its reported business of "Thoroughbred Horse Racing."

from charging back any of its capital losses against Charles Town and would not extend Fairmount's financial responsibility beyond the agreed advances for failures by Charles Town or liability for its torts. Here the Cohens selected the corporate form for the operation of the racing meets. One "is free to adopt such organization for his affairs as he may choose and having elected to do * * * business as a corporation, he must accept the tax disadvantages." Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 358, 84 L.Ed. 406 (1940).

Finally, Charles Town objects to the allocation to it of the *entire* net income from the racing meets on the basis that the "allocation of all the fruits to Charles Town alone is directly contrary to the requirement" in Section 482 that "the Secretary or his delegate may distribute, apportion, or allocate * * * between or among * * * " the controlled businesses. This contention is without merit. The Commissioner has broad discretion in making such allocations and they will not be countermanded unless the taxpayer shows them to be unreasonable, arbitrary, or capricious. E. g., Spicer Theatre, Inc. v. Commissioner of Internal Revenue, 346 F.2d 704, 706 (6th Cir. 1965); Ballentine Motor Co. v. Commissioner of Internal Revenue, 321 F.2d 796, 800 (4th Cir. 1963); Aiken Drive-In Theatre Corp. v. United States, 281 F.2d 7, 10 (4th Cir. 1960); Dillard-Waltermire, Inc. v. Campbell, 255 F.2d 433, 435–436 (5th Cir. 1958). Moreover, this circuit recently has held specifically that the Commissioner may transfer the total income and expenses of one controlled corporation to another under Section 482. J. R. Land Co. v. United States, 361 F.2d 607 (4th Cir. 1966).

In view of our conclusion that the Tax Court was not clearly erroneous in finding that Charles Town itself earned the income from the two racing meets, the Commissioner's allocation of the *total* net income to Charles Town plainly is not unreasonable or arbitrary. Anticipatory agreements designed to prevent the vesting of income in the owners, which was determined to be the essential nature of the intercorporate agreements in the instant case, will be disregarded and the tax assessed against the entity earning the income. National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81 (1940); Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930).

The decision of the Tax Court is affirmed.

Affirmed.