**W. BRAUN CO., Inc., Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 304, Docket 31788.

United States Court of Appeals Second Circuit.

Argued April 4, 1968.

Decided June 13, 1968.

Jerome Kamerman, New York City, for petitioner-appellant.

Chester C. Davenport, Jr., Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Elmer J. Kelsey, Attys., Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before MOORE, WOODBURY * and SMITH, Circuit Judges.

MOORE, Circuit Judge:

This case was brought to contest an asserted deficiency of $8,665.98 in the income tax return of W. Braun Co., Inc., petitioner-appellant, for the fiscal year ended February 29, 1960. The deficiency arose because the Commissioner, acting pursuant to 26 U.S.C. § 482,[1] attributed to the petitioner all the taxable income of Braunware Products Co., Inc., a corporation wholly-owned by petitioner.

Three corporations are involved. Both the ownership interest therein and the chronology of events are important in deciding the proper tax consequences of the facts hereinafter set forth.

1. *W. Braun Co.*, an Illinois corporation ("Braun Chicago"), was owned in equal shares by Mary Braun and her three children, Morris, Julius and Mrs. E. C. Erenberg. "Braun Chicago was engaged in the sale at wholesale of bottles and glass products to manufacturers of pharmaceuticals and cosmetics and to others" (Op. T.C.).

2. *W. Braun Co. Inc.*, petitioner was incorporated in New York in 1946. Two-thirds of its stock were owned by the Brauns in equal shares. The other one-third was owned equally by two persons, A. A. Friedberg and M. J. Tauger, who were unrelated to the Brauns. Petitioner had been "organized to conduct the same type of business in the northeastern part of the United States as was conducted in the midwest by Braun Chicago" (Op. T.C.) under a territorial agreement that was in effect between them. Friedberg had been hired by the Brauns to run the petitioner. Both Friedberg and Tauger were employed full time by petitioner, were vice-presidents and received the major portion of the salaries paid, Friedberg receiving various amounts ranging between $14,638 and $20,250 and Tauger between $12,615 and $20,250 for the taxable years ending, respectively, in February 1956 to 1960.

3. *Braunware Products Co., Inc.* ("Braunware"), was incorporated in New York in 1956. Petitioner was the sole owner of its stock and its officers and directors occupied the same positions in Braunware. Braunware's business was to sell "at wholesale cosmetic travel packages and glass containers of the same type sold by the petitioner. It conducted its business on the petitioner's premises and used the petitioner's office, telephone and correspondence facilities" (Op. T.C.). Braunware during its first taxable year ending July 31, 1957, sustained a net operating loss of $4,772.68. It remained inactive thereafter until November 1959. As of August 1, 1959, its net assets were $5,172.32.

The business arrangements between Braun Chicago and petitioner (primarily a selling organization) called for the purchase by Braun Chicago from manufacturers of the merchandise sold by petitioner. The manufacturers shipped directly to petitioner's customers and looked to Braun Chicago for payment. Braun Chicago in turn billed petitioner at cost and petitioner billed its customers, paying Braun Chicago 2% of its net sales for its services.

In June 1959 a substantial customer of Braun Chicago, Lanolin Plus, Inc., a cosmetic manufacturer, moved its plant from Chicago to Newark, New Jersey,

---

* Of the First Circuit, sitting by designation.

1. Sec. 482. Allocation of Income and Deductions among Taxpayers

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

to wit, out of Braun Chicago's territory into petitioner's. Thus, for all practical purposes the responsibility for this account fell on petitioner's operating officers Friedberg and Tauger. As owners of a one-third interest in petitioner, they had a real financial stake in the account. Their concern with respect to the Lanolin Plus account (evidenced as early as June 11, 1959—letter from Friedberg to Julius Braun (Exh. 17)), has been well summarized by the Tax Court as follows:

"Both Friedberg and Tauger, while recognizing that the Lanolin Plus account was a profitable account for the petitioner to have, were concerned about the risk entailed in dealing with Lanolin Plus because of the size of the account and some of the ventures that Lanolin Plus was engaged in. They thought that the business of the petitioner, and consequently their individual interests in the petitioner, might very well be destroyed if Lanolin Plus should become insolvent, and therefore wanted to eliminate the risk of such account. Both Friedberg and Tauger expressed their concern to Morris and Julius Braun. Friedberg recommended to them that the petitioner cease making shipments to Lanolin Plus and that the sales of Lanolin Plus be handled by the petitioner's inactive subsidiary, Braunware. The other officers of the petitioner agreed to Friedberg's suggestion."

There was a factual basis for the worries of Friedberg and Tauger. While Lanolin Plus returned a modest profit in 1959, it sustained a substantial loss in 1958. A large part of its assets were intangibles (patents, etc.) and a very high proportion of its costs were advertising and other selling expenses. When petitioner acquired the account, Lanolin Plus' debt to Braun Chicago stood at $250,000, one-fifth of which was past due. It took Friedberg six months to succeed in collecting the full amount for Braun Chicago. Finally, several Dun & Bradstreet reports showed that while

Lanolin Plus paid most of its bills on time, it was "slow" or in arrears with several of its creditors.

Subsequent to September 1959, the Lanolin Plus account was transferred to the 1956-incorporated Braunware. Under an agreement with Braunware, Braun Chicago received as its fee for services rendered 50% of Braunware's gross profits or approximately 10% of its net sales [petitioner's gross profit was some 20% of its net sales]. In September 1959 petitioner ceased making shipments to Lanolin Plus and in November 1959 Braunware commenced handling the account. Braunware did not have separate offices but it kept its own bank account, books, and records. Friedberg was still in charge of the account and it was agreed that petitioner would receive 2% of Braunware's net sales for the use of its facilities and Friedberg's talents. For the fiscal year ended February 29, 1960, Braunware reported a net profit of $17,208.00 from which it deducted its total net operating loss of $4,827.68. Petitioner's net income for the same period totalled $23,461.25. The deficiency arose because the Commissioner, acting under powers bestowed upon him by section 482 of the Internal Revenue Code of 1954, allocated all the taxable income of Braunware to petitioner.

The congressional purpose of section 482 was to prevent the use of controlled corporations to evade or avoid otherwise payable taxes by means of shifting profits or by other financial devices. The courts have given broad scope to the Commissioner's discretion in making reallocations of income. On the other hand, the exercise of this power cannot be unreasonable or arbitrary. The Tax Court and other reviewing courts have endeavored to examine carefully the relationship between the controlled corporations to ascertain whether there was a "sound business purpose" served by the use of the other corporation or whether the transaction was a mere sham to effect tax evasion. Before analyzing the facts, the precepts must be

noted that a taxpayer "is not required to adopt or continue with that form of organization which results in the maximum tax upon business income" and that when a taxpayer chooses to conduct his business in a certain form, "the tax collector may not deprive him of the incidental tax benefits flowing therefrom, unless it first be found to be but a fiction or a sham." Polak's Frutal Works, Inc. v. Comm'r, 21 T.C. 953, 973–974 (1954). In final analysis, "[e]ach case must be decided on its own facts." (Id. 974.)

■ The facts as found by the Tax Court so far as applicable are accepted as basic. The Commissioner contends "that the purpose of the petitioner's transfer of the Lanolin Plus account to Braunware was to take advantage of the net operating loss deduction which Braunware had available and Braunware's surtax exemption" (Op.T.C.). The Tax Court held that "[w]hile there is no evidence which specifically indicates that such was the purpose, the evidence does not affirmatively establish that such was not the purpose." True, "the petitioner did not, in connection with the transfer, have the advice of an attorney or an accountant" and one of petitioner's officers and stockholders knew of the unused tax loss and surtax exemption, but business transactions conducted without the advice of attorney or accountant are not *per se* illegal and knowledge of the law permitting corporate surtax exemptions creates *no presumption* that the purpose of the transaction was the evasion of income taxes. The Tax Court also held that "petitioner has failed to show that the allocation was not necessary in order clearly to reflect the income of the petitioner, within the meaning of section 482" (Op.T.C.).

■ Although the facts justified both Commissioner and Tax Court in critically analyzing the Braunware transaction in the light of the family control of these corporations, we believe that the petitioner has shown sufficiently "sound business reasons" for the Braunware transaction and that to hold otherwise would be to substitute the Commissioner's business judgment for that of petitioner's officers and directors without a factual showing of unlawful purpose.

The financial welfare of Friedberg and Tauger was dependent upon petitioner's welfare and stability. Since 1956 at least they had received moderately substantial salaries from petitioner. The Brauns were in a way absentee owners but Friedberg and Tauger were the actual owner-executives on location managing the business.

The 1959 acquisition of the Lanolin Plus account was therefore not an unmixed blessing to Friedberg and Tauger. It was not unreasonable for them to assume that Lanolin Plus would continue to run a receivable balance on petitioner's books about two-and-one-half times greater than petitioner's net worth of $102,000. Since most of this money was invested in special order merchandise, if Lanolin Plus went bankrupt because of the failure of a promotional campaign, petitioner could not hope to resell its inventory. While petitioner did have credit insurance in the amount of $75,-000 (this amount was later doubled when Braunware took over the account), in the event of Lanolin Plus' insolvency, petitioner's continued existence and Friedberg's and Tauger's investment therein would be in dire jeopardy. Nor was the subsequent collection of the $250,000 Lanolin Plus indebtedness proof of its stability. The transfer to Braunware must be viewed prospectively from the date June 1959.

While the transfer of the account was mainly desired by petitioner's New York management, it also appealed to the Brauns. Braun Chicago would still supply most of the merchandise requirements of petitioner as well as Braunware. From the Brauns' point of view, one effect of the transfer of Lanolin Plus from the petitioner to Braunware was the loss of security afforded by petitioner's net worth ($102,000) compared to that of Braunware (only ($5,000 as

of August 1, 1959). However, they felt adequately compensated because under the agreement with Braunware, Braun Chicago received as its fee 50% of Braunware's gross profits or approximately 10% of its net sales [petitioner's gross profit was approximately 20% of net sales]. Under its agreement with petitioner Braun Chicago received only 2% of net sales as its fee, or one-fifth as much for the same service.

The Tax Court took the position that there was no reasonable business purpose behind the transfer of the Lanolin Plus account to Braunware and that the primary reason for the transaction was the evasion of income taxes (via utilization of the net operating loss carryover and the additional surtax exemption). We find this holding to be based on an overly optimistic view of the risks involved in handling the Lanolin Plus account. The court's own findings as to the motivation of the parties in transferring the account and the record evidence compel the conclusion that the transfer was for a good business reason.[2] While the Tax Court might disagree with the soundness of, or the necessity for, the decision reached by petitioner's management, their decision was nevertheless a reasonable business judgment which must be respected as such.

■■ The Commissioner was therefore not justified in arbitrarily allocating all of Braunware's taxable income to petitioner. Such an allocation is authorized only when there is no business purpose to the challenged transactions or corporate structure.[3] Section 482 does not give the Commissioner the power to disregard separate corporate entities if they are being used for a bona fide business purpose.[4] The mere fact that the Lanolin Plus account could have been handled by petitioner is irrelevant.[5]

In Simon J. Murphy Co. v. Commissioner of Internal Revenue, 231 F.2d 639, 644 (6th Cir. 1956), the court stated that § 45, the predecessor of § 482, was aimed at:

"circumstances involving an improper manipulation of financial accounts, an improper juggling of the accounts between the related organizations, an improper 'milking' of one business for the benefit of the other, or some similar abuse of proper financial accounting, all made possible by the control

2. See Johnson Bronze Co. v. Comm'r, 24 TCM 1542, 1552 (1965). Counsel for the Commissioner suggested on oral argument that the Lanolin Plus account was not any riskier than petitioner's other accounts. It was conceded, however, that there was nothing in the record to support this contention, and the size of the account alone would appear to place it in a different category from petitioner's other accounts.

3. See Charles Town, Inc. v. Comm'r of Internal Revenue, 372 F.2d 415 (4th Cir.), cert. denied, 389 U.S. 841, 88 S.Ct. 69, 19 L.Ed.2d 104 (1967); J. R. Land Co. v. United States, 361 F.2d 607 (4th Cir. 1966); Advance Machinery Exchange, Inc. v. Comm'r of Internal Revenue, 196 F.2d 1006 (2d Cir.), cert. denied 344 U.S. 835, 73 S.Ct. 45, 97 L.Ed. 650 (1952); cf. Shaw Construction Co. v. Comm'r of Internal Revenue, 323 F.2d 316 (9th Cir. 1963); James Realty Co. v. United States, 280 F.2d 394 (8th Cir. 1960). See generally, Mertens, Law of Federal Income Taxation § 38.63.

4. Mel Dar Corp. v. Comm'r of Internal Revenue, 309 F.2d 525 (9th Cir. 1962), cert. denied, 372 U.S. 941, 83 S.Ct. 933, 9 L.Ed.2d 967 (1963); Comm'r of Internal Revenue v. Chelsea Products, 197 F.2d 620 (3rd Cir. 1952); Bush Hog Mfg. Co., Inc., 42 T.C. 713 (1964); Polak's Frutal Works, Inc. v. Comm'r of Internal Revenue, 21 T.C. 953 (1959); Johnson Bronze Co. v. Comm'r, 24 TCM 1542, 1556 (1965); Esrenco Truck Co. v. Comm'r, 22 TCM 287 (1963).

5. See Comm'r v. Chelsea Products, supra; Advance Machinery Exchange, Inc. v. Comm'r, supra n. 2; Johnson Bronze Co. v. Comm'r, supra; Regulation §. 1.482–1 (b) (3); Mertens, supra n. 3 ("The identity of the businesses is to be preserved, and the Secretary or his delegate has no authority under this provision to merge them into one single business, unless the businesses are carried on and manipulated in such a way as to constitute in effect one single business, or unless the 'controlled enterprise' is a sham [citations omitted]"); but see Hamburgers York Road, Inc., 41 T.C. 821 (1964).

of the two businesses by the same interests. When the Commissioner determined that a transaction between the controlled parties was not 'at arm's length,' an allocation would be justified in order to reflect the true net income which would have resulted if one uncontrolled taxpayer had dealt at arm's length with another uncontrolled taxpayer. Substance has been substituted for form."

See also Spicer Theatre, Inc. v. Comm'r of Internal Revenue, 346 F.2d 704 (6th Cir. 1965); Aiken Drive-In Theatre Corp. v. United States, 281 F.2d 7 (4th Cir. 1960); Asiatic Petroleum Co. (Delaware) v. Comm'r of Internal Revenue, 79 F.2d 234 (2d Cir.), cert. denied, 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459 (1935); Regulation § 1–482(1) Mertens, Law of Federal Income Taxation § 38.61.

In summary, in opposition to the Commissioner's unsupported finding of unlawful purpose, there are definite facts which point to an opposite conclusion, i. e., (1) Braunware was not organized for tax evasion purposes but prior to the occasion of the Lanolin Plus account transfer; (2) the financial positions of Friedberg and Tauger in petitioner were quite distinct from those of the Braun family; (3) the relocation of the Lanolin Plus plant was not part of some scheme on petitioner's part; (4) the territorial division agreement pursuant to which the Lanolin Plus account was transferred from Braun Chicago to petitioner; and (5) the admitted concern of Friedberg and Tauger with respect to the Lanolin Plus account.

To give recognition to salesmen's interests, the Tax Court in Bush Hog Manufacturing Co., Inc., 42 T.C. 713 (1964), found that the formation of six additional separate sales corporations was for "sound business reasons" and "to permit the salesmen to acquire proprietary interests in the company they worked for, * * *." Id. 727. There would seem to be as sound business reasons here for protecting the salesmen responsible for petitioner's business activities and welfare.

The Tax Court, as an alternative ground of decision, held that "petitioner has failed to show that the allocation was not necessary in order clearly to reflect the income of the petitioner * * *." The Commissioner therefore argues that even if his allocation of income was not necessary to prevent the evasion of tax, it was necessary to reflect the "true taxable income" of petitioner. See Regulation § 1.482–1(a) (6). The Tax Court, which was in agreement with this view, supported its conclusion by pointing to the fact that "the record fails to show that Braunware paid petitioner any consideration whatever for the account" and by questioning whether 2% of Braunware's net sales was adequate to reimburse petitioner for the use of its personnel and facilities when petitioner's ratio of expense to sales was much higher. Petitioner argues that as to the latter item, the Tax Court, in comparing expense ratios, failed to make any allowance for the fact that Braunware was a cash basis taxpayer while petitioner was on the accrual system— hence, Braunware's obligation to pay one-half of its gross profit to Braun Chicago and other expenses were not accrued on its books. Furthermore, payment by Braunware to petitioner for the Lanolin Plus account was not the only way by which consideration could be shown. The mutual corporate undertakings of the respective owners under some circumstances might well be adequate consideration. Be that as it may, even if both points were decided favorably to the Commissioner, petitioner has still shown that an allocation of all of Braunware's net income to it is unreasonable and arbitrary, Oil Base, Inc. v. Comm'r of Internal Revenue, 362 F.2d 212, 214 (9th Cir. 1966); Comm'r of Internal Revenue v. Chelsea Products, 197 F.2d 620, 624 (3rd Cir. 1952), because it is clear that an uncontrolled taxpayer would insist on receiving some net income after expenses before agreeing to take over the Lanolin Plus account. The Commissioner

has considerable discretion as to the amount which he may allocate from one controlled taxpayer to another (see Eli Lilly & Co. v. United States, 372 F.2d 990 (Ct.Cl. 1967)), but he cannot make entirely arbitrary apportionments.

We therefore remand to the Tax Court for a determination of the proper amount of income, if any, that should be allocated to petitioner from Braunware.

Reversed and remanded.