SALYERSVILLE NATIONAL BANK, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 77–1707.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 26, 1979.

Decided Jan. 30, 1980.

James A. Shuffett, Shuffett, Kenton, Curry & Karem, Lexington, Ky., for plaintiff-appellant.

Patrick H. Molloy, U. S. Atty., Lexington, Ky., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Section, Gary R. Allen, Gilbert S. Rothenberg, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WEICK and KENNEDY, Circuit Judges, and CECIL, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiff Salyersville National Bank appeals from a summary judgment dismissing its claim for a refund of federal income taxes paid for the calendar years 1969, 1970, and 1971. The Internal Revenue Service assessed taxpayer bank on the amount of commissions for credit life insurance purchased by the bank's borrowers from the bank president, a licensed life insurance agent. Taxpayer bank did not require credit life insurance on every loan. However, for those on which it did and in those in-

stances where the borrower wished insurance, it was taxpayer bank's practice to refer borrowers either to its president or to other agents or to ask for an existing policy as collateral. If insurance was purchased from the bank president, the bank would usually add the amount of the premium to the loan amount and credit the agency's account. At other times customers wrote checks directly to the president. It is the contention of the Commissioner of the Internal Revenue Service that the credit life insurance commissions paid by the bank's borrowers to the bank's president were actually income to the bank, which was then distributed to the president as dividends. The bank contends that the sums were never received by it and that its practices were the result of legitimate business needs and the requirements and demands of state law.

Taxpayer paid the deficiency assessment and filed a claim for refund with the IRS which stated:

Certain life insurance commissions were incorrectly included as income of taxpayer resulting from the examination of the returns by a representative of the Internal Revenue Service. These commissions were paid under agreements with individual agents of the various insurance companies.

Taxpayer bank is prohibited by law from receiving insurance commissions or engaging in the insurance business so that the allocation of these commissions to taxpayer was in error since they were not and could not be earned by them [sic]. See: *Comm. v. First Security Bank of Utah*, 405 U.S. 394[, 92 S.Ct. 1085, 31 L.Ed.2d 318] (1972).

No action was taken on the claim, and on May 2, 1974, more than six months later, the taxpayer filed this action in the Federal District Court for the Eastern District of Kentucky. The complaint set forth several grounds upon which relief should be granted: (1) the commissions attributed to it were never in fact received by it; (2) taxpayer was not a licensed agent which could legally receive such commissions; (3) those who directly received such commissions were not owned or controlled by the same interests; and (4) the redistribution of income does not clearly reflect the income of plaintiff and other affected parties. Cross motions for summary judgment were filed at the order of the district judge, and summary judgment was granted in favor of the IRS, on the ground that the taxpayer was not barred by state law from becoming an insurance agent and thus the Commissioner's allocation of this income to taxpayer bank under 26 U.S.C. § 482 properly reflects the income of plaintiff. The court refused to consider grounds (3) and (4) since they had not been set forth in the claim for refund as required by 26 U.S.C. § 7422(a); 26 C.F.R. § 301.6402–2(b)(1).

■ We agree with the District Court that plaintiff is barred from relying on any bases for relief not raised in its claim for refund, *Estate of Bird*, 534 F.2d 1214 (6th Cir. 1976); *Angelus Milling Co. v. CIR*, 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945). Taxpayer bank concedes that this is the settled rule but urges that the IRS has waived this defense by failing to assert it in its answer to plaintiff's complaint. The answer was filed at a time when appellant could have timely filed an amended claim for refund. The defense that some of the grounds relied on in plaintiff's complaint are not available to it because not included in the claim for refund was raised for the first time on the motion for summary judgment.

■ The Commissioner may waive the requirement that the detailed grounds and facts be stated in the claim for refund but does so only where such intention is unmistakable. *Angelus Milling Co. v. CIR, supra,* at 297, 65 S.Ct. 1162; *see also Tucker v. Alexander*, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253 (1927) (waiver found where the government stipulated an issue not raised in the claim was an issue for trial and the issue was in fact tried); *United States v. Henderson Clay Products*, 324 F.2d 7 (5th Cir. 1963) (an amended complaint raising an issue not included in the claim was filed without objection and an answer filed thereto); *United States v. Pierotti*, 154 F.2d

758 (9th Cir. 1946) (the issue of variance from the claim was not raised until the court filed its findings of fact after trial). In *Duffin v. Lucas*, 55 F.2d 786 (6th Cir. 1932) the government objected to an amendment to allege a basis for refund not included in the claim. This court held that there was no waiver even though proofs were taken on this issue where the court had reserved its ruling on the objection. In each case where waiver was found, there was some affirmative conduct indicating a willingness to litigate the issue. The mere failure to raise the variance between the refund claim and the allegations of the complaint does not indicate an intent to litigate the additional grounds for refund.[1] Taxpayer bank is therefore limited to the grounds raised in its claim of whether it could legally receive the insurance commissions.

## ILLEGALITY

■ Taxpayer claims that in the relevant years it did not become a licensed insurance agent and was thus barred by Kentucky law from receiving insurance commissions. It further claims that until the revision of the state insurance code in 1970, it was absolutely barred from becoming an insurance agent. There were, it states, legitimate business reasons for arranging its affairs as it did, and those reasons were not subterfuges whose only purpose was the avoidance of income taxes. It is undisputed that the bank found it necessary to make some arrangements whereby its loan customers could apply conveniently for credit life insurance policies. In addition to the benefits of providing a service to its customers which it believed it could not legally offer directly, the bank derived other benefits from the arrangement. It protected itself from primary liability, did not have to purchase errors and omissions insurance, and did not have to comply with Kentucky law in order to become an agent (after 1970), including the payment of license fees and possibly the amendment of its charter.

It should be noted that such an arrangement has the further virtue of being more permanent, since banks in cities over 5000 population had been and were then barred from selling insurance by federal banking law, 12 U.S.C. § 92; *see also Alabama Association of Insurance Agents v. Board of Governors of Federal Reserve System*, 533 F.2d 224 (5th Cir. 1976).

The IRS asserts that the District Court correctly ruled the taxpayer was not barred by Kentucky law from becoming a life insurance agent. It claims that the fact Kentucky law prohibits a licensed agent from splitting fees with an unlicensed person does not change that result, since the taxpayer bank could have become licensed. The Commissioner appears to be principally contending that if the bank had the capability of making itself eligible to receive any commissions it was required to do so, even if it could legitimately choose not to do so.

26 U.S.C. § 482 provides as follows:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The Commissioner is granted broad discretionary powers under this section to reallocate income, and the burden is placed on the taxpayer to prove that the reallocation is arbitrary. *Spicer Theatre, Inc. v. CIR*, 346 F.2d 704, 706 (6th Cir. 1965). The determination initially is the result of a broad ranging inquiry into the details of the questioned transaction as they actually occurred; the functions which were performed to accomplish the transactions; and

---

1. In view of this court's holding, it is not necessary to consider other bases for enlarging plain-

tiff's claim such as the right to amend, which might be available.

any measure of economic value as established through the operation of arm's length comparable transactions. Pursuant to the statute, the Commissioner reallocates money attributed to one taxpayer to another if it is found that there are

circumstances involving an improper manipulation of financial accounts, an improper juggling of the accounts between the related organizations, an improper "milking" of one business for the benefit of the other, or some similar abuse of proper financial accounting, all made possible by the control of the two businesses by the same interests.

*Simon J. Murphy Co. v. CIR*, 231 F.2d 639, 644 (6th Cir. 1956).

Section 482 clearly reflects a judgment on the part of Congress that controlled entities have the means and motivation to manipulate income in a manner which reflects neither reality nor sound business practice in order to evade taxes, *W. Braun Co. v. CIR*, 396 F.2d 264, 266–67 (2d Cir. 1968), and the IRS should thus have the power to reallocate such income to reflect the substance of the transactions. Such a reallocation is proper, however, only when there is no legitimate business purpose to the transactions. *Id.* at 269. Taxpayers are not required to arrange their affairs in such a way as to maximize the taxes owed the IRS. There is no question that taxpayers may structure their business affairs as they consider to be in their best interests. They may split their business, if there is a legitimate purpose in doing so, and if each part is run separately, *In re Gettler*, T.C.Mem. (P–H) ¶ 75,087 (1975), and they may structure them lawfully in order to minimize taxes. *CIR v. First Security Bank of Utah*, 405 U.S. 394, 398 n. 4, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972); *Johnson Bronze Co. v. CIR*, 24 T.C.M. 1543, 1554 (1965). The power to refer business from one controlled entity to another does not convert one part's income into the income of the other. *Gettler, supra*. Obviously, the mere fact alone, that one part of a controlled organization could have handled the business of the other or that the businesses were run as they were rather than in another way is irrelevant to the final decision of reallocation. *W. Braun Co. v. CIR*, 396 F.2d 264, 296 (2d Cir. 1968).

The principal business justification which the taxpayer contends supports the arrangement as a legitimate one is based on the Kentucky insurance code. That code as written, at least before its revision in 1970, is ambiguous on the principal points in contention here. It is clear that under both the pre-1970 and post-1970 codes, banks could not require a borrower to negotiate life or health insurance through a particular agent as a condition of a loan. Ky.Rev. Stat. § 304.935 (1950); § 304.12–140 (1970). The parties differ as to whether or not a bank, having complied with this part of the law, could receive an insurance commission. Prior to 1970, the law provided that no person "other than a duly licensed life insurance agent, [may] accept any such commission or other valuable consideration." § 304.565(2) (1950), and "No licensee shall divide with others or share in any commission payable on account of insurance subject to this code." § 304.554(2) (1950). The penalty for violating the latter section was revocation of the agent's license for one year and additional penalties. § 304.-554(2)(c), (4) (1970). After 1970, the law provided: "No agent or solicitor shall directly or indirectly share his commission or other compensation received . . . with any person not also licensed as agent or solicitor under this subtitle as to the kinds of insurance involved in the transaction." § 304.9–420 (1970). There is thus no question that an unlicensed person could not legally have received the commissions at issue here.

Prior to 1970, Kentucky law provided that one became a life insurance agent by procuring a life insurance license pursuant to §§ 304.510 to 304.574, which includes provisions of the nonlife code. *See* § 304.-565(1) (1950). Section 304.517(1), part of the code dealing with the licensing of agents other than life or title, provided: "No license shall be issued except to an individual. A firm or corporation shall not be licensed." The express language of the code then made this a requirement for life

insurance agents as well. In addition, the code provided:

> A partnership or corporation may hold agency contracts, but the members of the partnership and all officers, stockholders, or employes of the corporation who solicit, negotiate or effect contracts of insurance shall be required to qualify individually as agents in lieu of the partnership or corporation, and to be individually licensed as such agents.

§ 304.526. The import of this latter section is ambiguous; however, it appears in the section dealing with nonlife insurance agents, who expressly may not be corporations. "In lieu" commonly means "in place of." *Kena, Inc.*, 44 B.T.A. 217, 219–20 (1941). Thus corporations, being unable to procure a license, may seek to have their officers qualify in place of themselves.

After 1970, Kentucky law provided that "[a]n 'agent' is an individual, firm or corporation appointed by an insurer to solicit applications for insurance . . . on its behalf, and if authorized to do so by the insurer, to effectuate and countersign insurance contracts." § 304.9–020 (1970). The law further provided:

> A firm or corporation may be licensed as an agent. If a firm, each general partner and each other individual to act for the firm under the license, and if a corporation each individual to act for the corporation under the license, shall be named in or registered with the commissioner as to the license, and shall qualify as though an individual licensee. The commissioner shall charge and the insurer or licensee shall pay a full additional license fee as to each respective individual in excess of one named in or registered as to such license.

§ 304.9–130(1) (1970).

That code revision added one other important item to the code, possibly made necessary by the provision expressly permitting the licensure of corporations. The law was amended to add that a corporation could not be licensed unless "the transaction of business under the license is within the purposes stated in . . . the corporation's articles." § 304.9–130(3) (1970); *see also* §§ 287.140, 287.990.

There is a dearth of case law interpreting the Kentucky insurance code. Although there are some early cases which clearly permitted banks to become insurance agents, *Saufley v. Lincoln Bank & Trust Co.*, 210 Ky. 346, 275 S.W. 802 (1925); *Saufley v. Botts*, 209 Ky. 137, 272 S.W. 408 (1925), they do not aid in the interpretation of the insurance code enacted in 1950 in light of the express prohibitions in that code. Failure to comply with the code is clearly a violation of law. There is case law to the effect that one may be indicted for acting as an insurance agent without a license since one was required by law to be licensed. *Commonwealth v. Gaither*, 107 Ky. 572, 54 S.W. 956 (1900). There is at least one case which indirectly suggests that the practice of an officer of a bank acting as agent was not confined to the Salyersville Bank. *Hartford Fire Insurance Co. v. Moore*, 412 S.W.2d 860 (Ky.App.1967); *see generally SEG Employees Credit Union v. Scott*, 554 S.W.2d 402 (Ky.App.1977); *Stevenson v. Prudential Insurance Co.*, 346 S.W.2d 295 (Ky.App.1961).

The District Court held that although the literal language of the code before 1970 would bar corporations from becoming life insurance agents that the code should not be given such literal interpretation because it produces an absurd result. However, the Attorney General of the State of Kentucky in an opinion given to the Commissioner of Insurance of the State of Kentucky stated that life insurance agents must meet all the qualifications for licensure set out in Ky. Rev.Stat. §§ 304.511, 304.560, including section 304.517(1), which provides that "[n]o license shall be issued except to an individual." Ky.Atty.Gen.Op.No.40, 278 (1957).

In order to decide the question on appeal, it does not appear necessary to decide whether or not banks could be licensed as insurance agents under either law. *W. Braun Co. v. CIR*, 396 F.2d 264, 296 (2d Cir. 1968). In its answers to requests for admission the IRS admitted that the taxpayer bank was not a licensed insurance agent

pursuant to Kentucky law. (Defendant's admissions ¶ 2(d)). It clearly never met those requirements of Kentucky law which were prerequisites to becoming licensed and which it voluntarily could have met, assuming corporations could become agents. It did not, for example, pay the fee required by § 304.9–130(1) (1970). There is no claim it received authorization from any insurer to act as an agent, as required by § 304.9–020 (1970). There is no indication that its articles of incorporation permitted it to undertake such an agency, as required by § 304.9–130(3) (1970). In view of Kentucky law, both the 1950 and 1970 insurance codes having provided penalties for the violation of such requirements, §§ 304.990 (1950), 304.99–010 (1970), 304.99–020 (1970); see also §§ 287.140, 287.990, there can be no question that the receipt of these commissions by the taxpayer would have been illegal.

In *CIR v. First Security Bank of Utah*, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), the United States Supreme Court held that income could not be reallocated to a taxpayer who did not receive the income and who could not lawfully have received it. In *First Security* the Commissioner had reallocated credit life insurance premiums from a wholly owned insurance agency subsidiary of a holding company to a wholly owned bank subsidiary. The bank had been advised by counsel that it was prohibited by federal regulations from lawfully conducting the business of an insurance agency or receiving income from customers' purchase of credit life insurance as a bank [certain federal regulations prohibiting the same] in a city of over 5000 population. The bank was not licensed to sell insurance. The Commissioner reallocated 40% of the commissions to the bank as compensation for originating and processing the credit life insurance. The Court held that the holding company did not have the "complete power" to shift the insurance among its subsidiaries, because it would have been illegal for the bank to receive the commissions. Therefore, the income could not be reallocated. It approved the Tax Court decision in *Shunk Latex Products, Inc. v. Commis-*

*sioner*, 18 T.C. 940 (1952), which disallowed the Commissioner's attempt to reallocate income during World War II from a controlled distributor of rubber products to the manufacturer as moneys in fact earned by the manufacturer, on the grounds that the manufacturer was prohibited by OPA regulations from increasing its prices. The Tax Court had held that the Commissioner had "no authority to attribute to [the manufacturer] income which [the manufacturer] could not have received," 405 U.S. at 406, 92 S.Ct. at 1092–1093.

The Commissioner appears to take the position that the taxpayer bank had a duty to qualify as an insurance agent so that it could have legally received the income the Commissioner attempts to allocate to it. It points to no authority for that proposition. Rather the courts have stated that a taxpayer need not structure its business to maximize taxes. *W. Braun Co. v. CIR*, supra. The Commissioner's argument that it was within the power of taxpayer bank to take certain steps so that it could legally receive insurance commissions is similar to the argument he advanced in *Teschner v. Commissioner*, 38 T.C. 1003 (1962). The Tax Court rejected that argument saying:

In the case before us, the taxpayer, while he had no power to dispose of income, had a power to appoint or designate its recipient. Does the existence or exercise of such a power alone give rise to taxable income in his hands? We think clearly not. In *Nicholas A. Stavroudis*, 27 T.C. 583, 590 (1956), we found it to be settled doctrine that a power to direct the distribution of trust income to others is not alone sufficient to justify the taxation of that income to the possessor of such a power.

The United States Supreme Court expressly approved of that holding in *First Security National Bank of Utah*, supra, at 406 n.22, 92 S.Ct. 1085. So here, the fact that taxpayer may have had the power to enable it to receive the income legally does not require that it exercise that power. Unless it

did so, receipt of the income would have been illegal.[2]

Since we are of the opinion that the taxpayer bank could not legally receive the credit life insurance commissions, plaintiff was entitled to summary judgment as a matter of law. The judgment of District Court is reversed and judgment is entered in favor of the plaintiff-appellant.

2. It might be noted parenthetically that there is little or no likelihood that taxes have been lost by the Internal Revenue Service through the arrangements here. Were the entities controlled the funds, even if income to the bank, could have been offset by an increase in the president's salary in a like amount, which would have been deductible from income, with the result that there would be no increase in income taxes. Since taxpayer's president has paid income tax on the commissions it is improbable that there would be any change in his individual income.