YOUR HOST, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2673–69, 2675–69—2688–69, 446–70, 448–70—461–70, 1194–71—1207–71. Filed April 6, 1972.

---

[1] Cases of the following petitioners are consolidated herewith: Alro Realty, Inc., docket Nos. 2675–69, 461–70, and 1207–71; Boulevard Host, Inc., docket Nos. 2676–69, 448–70, and 1197–71; Chef Foods, Inc., docket Nos. 2677–69, 449–70, and 1198–71; Main Host, Inc., docket Nos. 2678–69, 450–70, and 1199–71; Niagara Host, Inc., docket Nos. 2679–69, 451–70, and 1200–71; Rochester Host, Inc., docket Nos. 2680–69 and 452–70; Royal Host, Inc., docket Nos. 2681–69, 453–70, and 1201–71; Sharlem Host, Inc., docket Nos. 2682–69, 454–70, and 1202–71; Telesnax, Incorporated, docket Nos. 2683–69, 455–70, and 1203–71; 309 Delaware Ave., Inc., docket Nos. 2684–69, 456–70, and 1206–71; Transit Host, Inc., docket Nos. 2685–69, 457–70, and 1205–71; Utica Host, Inc., docket Nos. 2686–69, 458–70, and 1204–71; Sher-Del Foods, Inc., docket Nos. 2687–69, 459–70, and 1195–71; and Your Host Bakery, Inc., docket Nos. 2688–69, 460–70, and 1196–71.

*Ralph J. Gregg* and *George M. Zimmerman*, for the petitioners.
*Stephen M. Miller* for the respondent.

IRWIN, *Judge:* Respondent determined the following deficiencies in the corporate income taxes of petitioners:

| Petitioner | Docket No. | Year | Deficiency | |
|---|---|---|---|---|
| | | | Sec. 482 | Sec. 531 |
| Your Host, Inc. | 2673-69 | 1965 | $154,584.83 | $93,040.86 |
| | | 1966 | 173,381.44 | 98,958.31 |
| | 446-70 | 1967 | 170,930.11 | 94,399.00 |
| | 1194-71 | 1968 | 170,198.45 | 93,000.00 |
| Alro Realty, Inc. | 2675-69 | 1965 | 3,541.84 | |
| | | 1966 | 2,791.52 | |
| | 461-70 | 1967 | 2,661.32 | |
| | 1207-71 | 1968 | 2,621.00 | |
| Boulevard Host, Inc. | 2676-69 | 1965 | 5,031.30 | |
| | | 1966 | 5,000.08 | |
| | 448-70 | 1967 | 4,795.04 | |
| | 1197-71 | 1968 | 5,500.00 | |
| Chef Foods, Inc. | 2677-69 | 1965 | 5,000.04 | |
| | | 1966 | 5,000.36 | |
| | 449-70 | 1967 | 4,999.96 | |
| | 1198-71 | 1968 | 5,500.00 | |
| Main Host, Inc. | 2678-69 | 1965 | 3,245.88 | |
| | | 1966 | 4,999.40 | |
| | 450-70 | 1967 | 5,000.44 | |
| | 1199-71 | 1968 | 5,500.00 | |
| Niagara Host, Inc. | 2679-69 | 1965 | 5,000.08 | |
| | | 1966 | 5,000.08 | |
| | 451-70 | 1967 | 4,999.84 | |
| | 1200-71 | 1968 | 5,500.00 | |
| Rochester Host, Inc. | 2680-69 | 1965 | 2,338.84 | |
| | | 1966 | 489.56 | |
| | 452-70 | 1967 | 216.36 | |
| Royal Host, Inc. | 2681-69 | 1965 | 5,000.12 | |
| | | 1966 | 5,000.76 | |
| | 453-70 | 1967 | 5,000.36 | |
| | 1201-71 | 1968 | 5,500.00 | |
| Sharlem Host, Inc. | 2682-69 | 1965 | 4,999.96 | |
| | | 1966 | 5,000.36 | |
| | 454-70 | 1967 | 5,000.04 | |
| | 1202-71 | 1968 | 5,500.00 | |
| Telesnax, Inc. | 2683-69 | 1965 | 4,279.32 | |
| | | 1966 | 4,904.76 | |
| | 455-70 | 1967 | 4,494.32 | |
| | 1203-71 | 1968 | 4,933.00 | |
| 309 Delaware Ave., Inc. | 2684-69 | 1965 | 4,999.80 | |
| | | 1966 | 5,000.32 | |
| | 456-70 | 1967 | 4,999.68 | |
| | 1206-71 | 1968 | 5,501.00 | |
| Transit Host, Inc. | 2685-69 | 1965 | 4,999.96 | |
| | | 1966 | 5,000.16 | |
| | 457-70 | 1967 | 4,773.68 | |
| | 1205-71 | 1968 | 3,653.00 | |
| Utica Host, Inc. | 2686-69 | 1965 | 5,000.36 | |
| | | 1966 | 4,690.48 | |
| | 458-70 | 1967 | 4,083.60 | |
| | 1204-71 | 1968 | 5,501.00 | |

12

| Petitioner | Docket No. | Year | Deficiency | |
|---|---|---|---|---|
| | | | Sec. 482 | Sec. 531 |
| Sher-Del Foods, Inc | 2687-69 | 1965 | 15,250.86 | 14,175.28 |
| | | 1966 | 19,998.48 | 21,377.40 |
| | 459-70 | 1967 | 19,087.40 | 28,709.00 |
| | 1195-71 | 1968 | 21,509.43 | 18,115.00 |
| Your Host Bakery, Inc | 2688-69 | 1965 | 5,000.08 | |
| | | 1966 | 5,045.36 | |
| | 460-70 | 1967 | 5,000.20 | |
| | 1196-71 | 1968 | 5,500.00 | |

Respondent has conceded that petitioners Your Host, Inc., and Sher-Del Foods, Inc., are not subject to the accumulated-earnings tax imposed by section 531 [2] for the years in question. After other concessions the following issues remain for decision:

(1) Whether respondent was arbitrary in allocating under section 482 all of the income and deductions of the 10 corporations operating restaurants and the vending machine corporation to Your Host, Inc.; and

(2) In the alternative to the first issue, whether the surtax exemptions provided by section 11(d) should be disallowed under section 269 in the cases of these 11 corporations; and

(3) Whether respondent was arbitrary in allocating under section 482 all of the income and deductions of Your Host Bakery, Inc., to Sher-Del Foods, Inc.; and

(4) In the alternative to the third issue, whether the surtax exemptions of Your Host Bakery, Inc., and Alro Realty, Inc., should be disallowed under section 269; and

(5) Whether as an alternative to proceeding under section 269 the surtax exemption of Alro Realty, Inc., should be disallowed under section 1551.

We need not consider the second issue if the first issue is found in respondent's favor, nor the fourth issue if the third is found in respondent's favor. Similarly, there will be no deficiencies against the restaurant corporations if we uphold respondent on the first issue and no deficiency against Your Host Bakery, Inc., if we uphold respondent on the third issue.

FINDINGS OF FACT

Some of the facts have been stipulated and they are so found. The exhibits attached to the stipulation are incorporated herein by this reference.

All of the petitioners herein are corporations chartered under the laws of the State of New York. For each of the years in question pe-

[2] All statutory references are to the Internal Revenue Code of 1954, as amended.

titioners filed their Federal income tax returns with the district director of internal revenue, Buffalo, N.Y. During the years in issue the business address and principal place of business of petitioners was 3491 Delaware Avenue, Kenmore, N.Y.

The founders, principal stockholders, and officers of all of the corporations involved herein were Alfred J. Durrenberger, Jr. (Durrenburger), and Ross T. Wesson (Wesson). Wesson was killed in an airplane crash on July 17, 1956, and Durrenberger died on October 28, 1968. Wesson and Durrenberger will in some instances be referred to as the partners.

Before going into business together in 1944, Durrenberger had been a butcher and the owner of a retail meat market in the village of Kenmore, N.Y., and Wesson had run a diner in the village of Gowanda, N.Y. On May 1, 1944, Wesson and Durrenberger filed a certificate in the office of the Clerk of Erie County that they were conducting business under the assumed name and style of "Your Host," giving their business address as 461 Kenmore Avenue, Kenmore, N.Y., and thereupon proceeded to open a hot dog stand at that location. In 1946 they purchased the land on which the hot dog stand was located.

In December 1944, Wesson and Durrenberger leased property at 2835 Delaware Avenue, Kenmore, N.Y., next to Durrenberger's meat market, made leasehold improvements therein, and opened their first restaurant, known as Your Host Restaurant.

In 1945 Wesson and Durrenberger opened two more restaurants in the Buffalo area. These restaurants were all similar in appearance, operation, and menu and each operated under the name of Your Host Restaurant.

Your Host, Inc. (hereinafter Your Host), was incorporated and commenced business on January 1, 1947, with Durrenberger and Wesson as equal stockholders. They transferred to it the business assets and liabilities they had acquired as a partnership, including the leasehold improvements at the three restaurants and the hot dog stand, for promissory notes totaling $62,518.15 and 100 shares of the common stock of the par value of $100 per share.

On March 20, 1947, Wesson and Durrenberger purchased lots on Delaware Avenue in the town of Tonawanda, N.Y., (now known as 3491 Delaware Avenue), upon which was located a one-story cement block building intended to be used as a commissary. They thereupon incorporated Sher-Del Foods, Inc. (hereinafter Sher-Del), to operate a food-processing plant and commissary, and it commenced business on September 1, 1947. They transferred to it the property which they had bought at 3491 Delaware Avenue and other current and fixed assets for promissory notes totaling $43,400 and 100 shares of common

stock of the par value of $100 per share. Sher-Del assumed Durren-berger's and Wesson's individual liabilities with respect to 3491 Delaware Avenue upon said transfer, and repaid the $43,400 promissory notes in the middle 1950's.

In 1947 Your Host opened two additional restaurants upon leased premises. These restaurants were similar in appearance, operation, and menu to the restaurants previously in business and each operated under the name of Your Host Restaurant.

On April 20, 1948, Wesson and Durrenberger, doing business as Your Host leased the premises at 309 Delaware Avenue, Buffalo, N.Y. The lease agreement required that the tenants operate a restaurant under the name of and in the manner of existing Your Host Restaurants. The lease further permitted the tenants to assign the lease to a corporation organized by them at which time their personal obligation for the rent would cease.

The prospects for a restaurant at 309 Delaware Avenue were not as favorable as those enjoyed at the other Your Host locations. The rent was higher there than for other locations ($250 to $300 per month over a 7-year period compared to a $200 maximum per month on a 10-year lease at 3232 Bailey Avenue). There were no adjacent parking facilities, and pedestrian traffic was not as heavy as at other locations. In light of these factors the attorney for Wesson, Durrenberger, and Your Host, F. Paul Norton (Norton), recommended that the restaurant at 309 Delaware Avenue be incorporated separately.

On June 9, 1948, Wesson and Durrenberger incorporated 309 Delaware Avenue, Inc. (hereafter 309 Delaware), as equal shareholders. Subsequently, 309 Delaware began operation of a Your Host Restaurant at 309 Delaware Avenue and became the assignee of the lease for those premises.

During the period from 1951 to 1954 Wesson and Durrenberger caused three more corporations to be formed to operate Your Host Restaurants. These corporations were Royal Host, Inc. (Royal), Telesnax, Inc. (Telesnax), and Utica Host, Inc. (Utica). The circumstance surrounding their incorporation are summarized below:

1. *Telesnax.*—Wesson and Durrenberger set up Telesnax with two principal ideas in mind. First, they desired to give their accountant, James L. Clements, an opportunity to obtain a proprietary interest in the success of Your Host Restaurants. Second, they desired to take advantage of the burgeoning popularity of television by offering viewers an opportunity to order meals on the telephone that would be delivered to their homes. The name Telesnax was designed to convey this second purpose to the public, and by using Telesnax as a corporate name they felt that they could prevent its appropriation by another operation.

Clements did in fact obtain one-third of the stock of Telesnax; however, the meals-at-home idea was never developed and no attempt was made to obtain trademark protection for the Telesnax name. Instead of using Telesnax to develop the meals-at-home idea, Durrenberger felt it advisable to use the new corporation to operate a Your Host Restaurant in some empty store space next to a supermarket. This restaurant was opened for business in 1951.

2. *Royal Host.*—No particularly compelling reason was offered at trial for the formation of Royal Host in 1951 by Wesson and Durrenberger. Clements testified that there was concern that there would be infringement upon the Your Host name by other businesses using a similar name. Consequently, the partners filed an application for incorporation under the name of The Host, Inc. This application was rejected because of its similarity to The Host, Incorporated, an already existing corporation. Incorporation of Royal Host and other corporations whose names included the word Host was seen as offering some protection for the Your Host business. The subsequent use of the Royal Host name by Wesson and Durrenberger is noted in the margin.[3]

Royal Host commenced operating a Your Host Restaurant in 1951 on leased premises.

3. *Utica Host.* Wesson and Durrenberger formed Utica Host in September 1954 to operate a Your Host Restaurant upon leased premises upon which a former tenant had operated a restaurant. This restaurant had failed and the landlord had become the owner of the restaurant assets. The former restaurant had a record of a small sales volume, was poorly designed, and was located in a "changing neighborhood." In light of these factors the partners decided the restaurant was a risky venture and should be separately incorporated.

Prior to 1953 all of the Your Host Restaurants except one were located in downtown commercial areas or in residential areas; however, in 1953 Wesson and Durrenberger became interested in placing restaurants in large suburban shopping plazas. At that time the development of large suburban shopping plazas was in its early stages. Norton recommended against placing Your Host Restaurants in the plazas because the shopping plaza idea was as yet untried in the Buffalo area, the plazas were not accessible to public transportation, and the onset of the Korean conflict made the availability of private automobiles and gasoline doubtful in his mind. In addition, placing res-

---

[3] The Your Host Restaurants were very simple establishments emphasizing hamburger sandwiches on their menus. Wesson wanted to open up a fancy restaurant or steak house which served liquor. In 1954 Wesson and Durrenberger formed Air Host, Inc., as equal shareholders. Air Host commenced operating a restaurant of the type desired by Wesson called the Royal Host. Respondent has conceded the cases involving Air Host, Inc., and has not allocated the income and deductions of Air Host to Your Host. These concessions notwithstanding, Air Host will be mentioned in the opinion. It is important to remember that the Royal Host Restaurant was run by Air Host, Inc., and not by Royal Host, Inc., or one of the other "Host" petitioners.

taurants in the plazas required a lease obligation of a longer term and for greater rent than Your Host had become accustomed to undertake. Because Wesson and Durrenberger felt that the plazas showed promise, Norton advised that each new restaurant be placed in a separate corporation in order to insulate Your Host in the event that the plazas did not live up to the partners' expectations.

During the period from 1953 to 1956 the following four corporations were organized to operate a Your Host Restaurant in a new shopping plaza:

| Corporation name (abbreviation) | Shopping plaza | Date incorporated | Year plaza restaurant opened |
|---|---|---|---|
| Boulevard Host, Inc. (Boulevard) | Northtown Plaza | June 1953 | 1953 |
| Niagara Host, Inc. (Niagara) | Marvin Gardens Plaza | February 1955 | 1955 |
| Transit Host, Inc. (Transit) | Transitown Plaza | May 1955 | 1956 |
| Sharlem Host, Inc. (Sharlem) | Sheridan-Harlem Plaza | June 1956 | 1957 |

Boulevard, Niagara, and Sharlem were each incorporated with Wesson and Durrenberger as equal shareholders. Transit was a wholly owned subsidiary of Your Host upon its organization. In December 1955 Your Host acquired all of the stock of Niagara, and in February 1957 Your Host acquired all of the stock of Sharlem.

In addition to the above changes in the corporate family tree, Royal acquired all of the stock of Utica in December 1955.

In September 1955 Durrenberger became interested in a location for a Your Host Restaurant near the village of Williamsville. Durrenberger decided to set up a separate corporation to operate a restaurant on this location because he felt that his own resources and those of the other corporations had become overextended with the expansion of the Your Host chain into the shopping plazas. At this time Wesson was occupying himself primarily with running the Royal Host Steak House, fulfilling his duties as an officer in both the local and national restaurant associations, and flying his private airplane. There was no economic reason peculiar to the Williamsville location which indicated the need for a separate corporation.

In September 1955 Main Host, Inc. (Main), was organized by Wesson and Durrenberger and in January 1956 all of its stock was acquired by Royal. During 1956 Main commenced operating a Your Host Restaurant upon the Williamsville location.

In early 1956 Wesson and Durrenberger became interested in developing a chain of Your Host Restaurants in the area of Rochester, N.Y., which is about 70 miles distant. Two of their Buffalo area

competitors had tried to penetrate the Rochester area previously without success. The partners anticipated problems stemming from the absentee management of the Rochester operations and were not confident of succeeding in the new area. Accordingly, they organized Rochester Host, Inc. (Rochester), in May 1956 as equal shareholders. After delays caused by the death of Wesson, Rochester opened its first Your Host Restaurant in the Rochester area in the latter part of 1957.

Rochester was the last corporation formed by the partners to operate Your Host Restaurants; however, new restaurants were added to the chain without creating any additional corporation. The following chart indicates the development of the Your Host restaurant chain from 1944 to 1969 by showing the names of the corporations and the years in which each first opened a restaurant as well as the latter years in which each corporation opened additional restaurants:

YEARS IN WHICH RESTAURANTS WERE OPENED

| Corporation | 1st | 2d | 3d | 4th | 5th | 6th | 7th | 8th | 9th | 10th thru 15th |
|---|---|---|---|---|---|---|---|---|---|---|
| Your Host | 1944 | 1944 | 1945 | 1945 | 1947 | 1947 | 1958 | 1959 | 1960 | 1969 |
| 309 Delaware | 1948 | 1949 | 1950 | 1959 | | | | | | |
| Royal | 1951 | | | | | | | | | |
| Boulevard | 1953 | 1966 | | | | | | | | |
| Utica | 1954 | 1958 | 1964 | | 1968 | | | | | |
| Niagara | 1955 | 1960 | 1964 | 1965 | | | | | | |
| Main | 1956 | 1959 | 1966 | | | | | | | |
| Transit | 1956 | 1960 | | | | | | | | |
| Sharlem | 1957 | 1960 | 1963 | | | | | | | |
| Rochester | 1957 | ¹ 1962 | ¹ 1962 | | | | | | | |
| Telesnax | 1951 | ² 1968 | | | | | | | | |

¹ Terminated business in 1968.
² Replaced first restaurant.

The capital needed for the expansion of the Your Host Restaurant chain came primarily from three sources: (1) Relatively small capital contributions from either the partners or one of the corporations; (2) substantial open-account interest-free cash loans from Your Host, Sher-Del Foods, or one of the other restaurant corporations; and (3) credit from Sher-Del for supplies used during the first few weeks of a new restaurant's business.

In all cases the corporations were only responsible for the rent payments on the premises on which they actually operated restaurants. In any case in which Wesson and Durrenberger, Your Host, or one of the restaurant corporations negotiated a lease for a new restaurant location the lease contained provisions permitting its transfer to another corporation without any liability on the part of the initial lessee. Apparently the lease between Wesson and Durrenberger and the landlord of 309 Delaware Avenue entered into in 1948 served as a model for all subsequent leases for Your Host Restaurants.

In 1947 Wesson and Durrenberger incorporated Sher-Del Foods, Inc., to operate a food-processing plant and commissary. The Your Host Restaurants were only able to buy meat and other supplies at retail prices; therefore, it was necessary to establish Sher-Del as a bona fide independent food wholesaler so that it could take advantage of the wholesale prices available to such concerns. The Your Host Restaurants buy all of their supplies from Sher-Del on an open-account basis; however, 30 percent of Sher-Del's business on the average is with outside customers. The prices charged Your Host Restaurants and outsiders are the same.

Initially Sher-Del operated the commissary business in a one-story building located at 3491 Delaware Avenue, Tonawanda, N.Y. Wesson and Durrenberger had purchased this building and nine lots at this address in 1947 and contributed them to Sher-Del. In 1948 and 1949 Sher-Del bought four lots adjoining the commissary, began to develop the property as a business block, and added storefront space. In 1950 Sher-Del improved and enlarged its commissary operation upon this property, and in August 1951 Royal commenced operating a Your Host Restaurant in the storefront space.

On October 1, 1951, Sher-Del sold this property to a new corporation formed by Wesson and Durrenberger, Alro Realty, Inc. (Alro), for $112,822.93 represented by a 4-percent promissory note.

Alro Realty, Inc., was formed in September 1951 with Wesson and Durrenberger as equal shareholders. The partners believed that they could obtain better mortgage financing if one corporation owned all of the real estate that at that time was owned by Your Host and Sher-Del. They also hoped to infuse some cash into Sher-Del when Alro paid the $112,822.93 note with which it purchased 3491 Delaware Avenue and adjacent land from Sher-Del. In fact, Alro was never particularly profitable and did not reduce the unpaid balance of the note below $110,000; however, Alro did purchase additional land adjacent to 3491 Delaware Avenue until it had acquired an entire city block. Upon this block it developed a small plaza which housed the business offices of all of the related corporations and provided space for unrelated tenants.

In 1955 the partners were presented with an opportunity to purchase a fully equipped bakery for an investment of $15,000 in cash and a mortgage of $18,000. Not only was the purchase price of the bakery favorable, but also the acquisition protected the restaurants from a loss of local supplies of sweet baked goods. A significant portion of the business of the Your Host Restaurants came from the sale of pies, cakes, doughnuts, and other sweet goods, and this business would suffer if an adequate supply of sweet goods could not be maintained.

Although the bakery would have assured purchasers for its products in the Your Host Restaurants, the partners felt that their inexperience in the baking business made the success of the bakery somewhat doubtful and that it would be best to limit the liability of the other businesses to the $15,000 cash investment. Accordingly, Your Host Bakery, Inc. (Bakery), was formed in November 1955 with Wesson and Durrenberger as equal shareholders to operate the bakery.

Bakery was a successful venture. It did not sell any of its products directly to the public or to the restaurants. Sher-Del took orders for baked goods from the restaurants and made purchases from Bakery. The prices which Sher-Del paid Bakery for baked goods and which the restaurants paid Sher-Del for the same items were identical and were based upon the wholesale pricelist of a commercial baking corporation.

Chef Foods, Inc. (Chef), was the last corporation to be formed. In 1956 Wesson and Durrenberger began exploring the idea of providing meal-catering service in industrial plants. The death of Wesson in 1956 and the expansion of the restaurant business caused Durrenberger to defer the development of the in-plant feeding idea. In 1958 he formed Chef Foods, Inc., to go into the in-plant feeding business; however, this business was never developed. Instead, Chef purchased vending machines in 1959 and 1962. These machines were placed only in Your Host Restaurants. In addition, Chef purchased refrigeration and storage plants located at 2646 Delaware Avenue in 1959. Sher-Del leased from Chef a part of these facilities for use in the commissary business and Chef used the other part for the vending business.

The Your Host Restaurants were all similar in appearance, served identical menus at the same prices, and were open for business 24 hours a day. In their advertising the restaurants tried to convey to the public that each restaurant was a part of a chain with the same management. No attempt was made to convey to the public the separate corporation ownership of some of the restaurants. Solicitations in the newspaper for employees were made in the name of Your Host Restaurants, and letters were sent under the cover "Your Host and Family Restaurants" even though they were signed in the name of individual corporations.

The president of each corporation was Durrenberger from Wesson's death in 1956 until his own death in 1968. Following her husband's death, Durrenberger's widow became the president of each corporation. As will be explained *infra*, the restaurants shared the same top management personnel. None of the corporations paid Your Host for use of the Your Host trademark.

Each of the corporations maintained its own minute book; however, the minutes recorded for Your Host were meager while those recorded

for the other corporations were nearly nonexistent. Each corporation had at least one bank account, and each restaurant maintained a depository account at a bank situated near to it. Deposits representing daily receipts of each restaurant were placed in the respective depository accounts and then transferred on a weekly basis to the bank account of the corporation to which they belonged. Each corporation used its own bank account to pay most of the expenses attributable to the operation of its restaurants. These expenses included supplies purchased from Sher-Del, utility bills, rent, Federal and State income taxes, social security taxes and income taxes withheld from employees, fire insurance, license fees, and sign bonds (where necessary).

Because Your Host could obtain master policies for public liability insurance and workmen's compensation covering all the restaurants and their employees for a cost that was less than the combined cost of separate policies for each corporation, Your Host advanced the premium payment to obtain such master policies. Your Host was then reimbursed by the other corporations for their share of the premium, which was computed by the insurer or its agent according to a formula based upon the payroll of each corporation.

At one time the corporations paid the wages for their employees in cash; however, in 1952 wages began to be paid by check for security reasons. For administrative convenience and to enable the employees to cash their checks without difficulty, salaries for all employees of every corporation were paid from a special zero-balance payroll account maintained by Your Host. This account worked in the following manner: Every week each corporation computed its own net payroll (after deduction for withholding items) and paid this amount into the "Your Host, Inc., Payroll Account"; all wages were then paid from this account leaving a "Zero balance." This payroll account was not carried as an asset upon the books of Your Host.

Each restaurant had its own manager who was generally responsible for the operation of his restaurant. His duties included ordering supplies and hiring and firing employees; however, the manager had no authority to change the menu of the restaurant, change its business hours, or purchase supplies from someone other than Sher-Del. The restaurant managers could not write checks. The managers were compensated on a salary-plus-bonus arrangement. The amount of the manager's bonus depended upon the success of his location.

The personnel needed to administer and maintain all 16 corporations were nominally the employees of Your Host; however, the expenses attributable to these employees were in fact shared by all of the corporations during the years in issue in the following manner:

(1) With exceptions noted below, the cost of the administrative staff (bookkeepers, typists, clerks, and the like), group insurance premiums, and the expenses of the administrative office were allocated among the corporations according to gross sales;

(2) Advertising costs were allocated among the corporations operating Your Host Restaurants in the Buffalo area according to gross sales;

(3) The cost of the maintenance crew and the salaries of the Your Host Restaurant area supervisors—six or seven men who each oversaw the operations of six or seven restaurants—were allocated among the corporations operating Your Host Restaurants.

The gross sales of Air Host which operated the Royal Host Restaurant were included in the administrative expense allocation at only half of actual sales excluding liquor sales. This adjustment was made to reflect the fact that the Royal Host Restaurant sold liquor and meals which were considerably more expensive than those available in Your Host outlets. The high price of Royal Host meals did not command a proportionately high amount of administrative effort.

The gross sales of Sher-Del were included in the administrative expense allocation at a figure that was less than actual sales to reflect the fact that intercorporate sales did not require a great deal of administrative effort and that Sher-Del employed a small administrative staff of its own. The figure used for gross sales was either one-half actual sales or twice sales to unrelated customers.

Rochester Host was not included in the advertising expense allocation because the Rochester restaurant could not benefit from Buffalo area advertising. It appears from the record that Your Host paid more than its share for advertising under the formula. No explanation can be found for the discrepancy except that Your Host may have paid entirely on its own for certain small advertising items like help-wanted ads.

The corporations not running restaurants and Air Host were allocated no part of the advertising or area supervisor expenses because these items related particularly to the sales of the Your Host Restaurants.

Although Your Host advanced the funds necessary to take care of the administrative, advertising, and supervisory expenses, each of the corporations did in fact pay its allocated share of the expenses. Only the allocable part of the expenses appear on the returns of each corporation.

In all of the years in issue Durrenberger drew part of his salary from each of the corporations. The following chart represents his draw from each corporation:

|  | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|
| Sher-Del Foods, Inc | $22,500 | $22,500 | $22,500 | $18,750 |
| Your Host, Inc | 12,600 | 12,600 | 11,400 | 11,400 |
| 309 Delaware Ave., Inc | 7,800 | 5,400 | 4,200 | 1,500 |
| Royal Host, Inc | 1,500 | 1,000 | 1,000 | 833 |
| Telesnax, Inc | 1,000 | 1,000 | 1,000 | 833 |
| Boulevard Host, Inc | 1,000 | 1,000 | 1,000 | 1,000 |
| Air Host, Inc | 1,100 | 1,000 | 1,000 | 833 |
| Utica Host, Inc | 1,100 | 1,500 | 2,000 | 1,667 |
| Niagara Host, Inc | 1,100 | 2,000 | 4,000 | 3,333 |
| Main Host, Inc | 1,100 | 1,200 | 2,000 | 1,667 |
| Transit Host, Inc | 1,100 | 1,200 | 1,200 | 1,333 |
| Sharlem Host, Inc | 1,100 | 1,500 | 2,000 | 1,667 |
| Rochester Host, Inc | 1,100 | 1,500 | 1,200 | 833 |
| Your Host Bakery, Inc | 1,000 | 1,500 | 1,500 | 1,333 |
| Alro Realty, Inc | 1,000 | 1,000 | 1,000 | 833 |
| Chef Foods, Inc | 1,000 | 1,500 | 1,500 | 1,333 |
| Total | 57,100 | 57,400 | 58,500 | 49,148 |

The 15 corporations reported the following amounts of taxable income for the years in issue:

|  | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|
| Your Host | $136,702 | $107,101 | $126,338 | $111,310 |
| 309 Delaware | 47,960 | 45,859 | 48,816 | 38,820 |
| Royal | 31,894 | 35,587 | 33,107 | 39,142 |
| Boulevard | 25,932 | 28,596 | 23,973 | 27,822 |
| Utica | 28,132 | 23,451 | 20,420 | 25,674 |
| Niagara | 36,646 | 58,971 | 71,358 | 58,031 |
| Main | 16,231 | 35,680 | 38,153 | 50,392 |
| Transit | 38,402 | 36,092 | 23,866 | 16,602 |
| Sharlem | 29,695 | 29,607 | 36,748 | 30,273 |
| Rochester | 11,693 | 2,447 | 1,082 | (Loss) |
| Chef | 31,098 | 42,882 | 41,727 | 35,760 |
| Telesnax | 16,459 | 18,737 | 17,284 | 17,253 |
| Bakery | 34,896 | 44,882 | 43,390 | 43,327 |
| Sher-Del | 41,212 | 79,494 | 158,231 | 64,816 |
| Alro | 17,708 | 13,799 | 13,309 | 11,908 |

OPINION

In 1944 Wesson and Durrenberger opened the Your Host hot dog stand in Buffalo as a partnership. In the same year they commenced operating the first Your Host Restaurant, a high-quality short-order restaurant. Two more Your Host Restaurants were opened in 1945. In 1947 Your Host, Inc., was formed by the partners to operate their hot dog stand and the three restaurants. In 1947 the partners formed Sher-Del to operate a commissary which would supply their restaurants and other customers. Between 1948 and 1956 10 more corporations were formed for various reasons (or for no apparent reason at all) to operate additional Your Host Restaurants. In 1951 the partners placed all of the real estate holdings of Your Host and Sher-Del into a new corporation, Alro, in order to develop these holdings commercially. In 1955 the partners formed Bakery to operate a bakery which would supply the restaurants with their needs for sweet baked goods. In 1958 Chef was formed to operate vending machines in Your Host Restaurants. No additional corporations were formed after 1958; however, the size of the restaurant chain grew considerably. In 1969 there were 40 Your Host Restaurants of which Your Host operated 15 with each of the 10 other restaurant corporations operating four or fewer locations.

After Wesson's death in 1956 all of the corporations except one were either wholly owned by Durrenberger or wholly owned subsidiaries of one of Durrenberger's corporations. Durrenberger was the president of each corporation, and all the corporations shared the same administrative personnel. All of the Your Host Restaurants operated by 11 corporations were similar in appearance, served the same menu, and were open for business 24 hours a day. Through advertising and telephone directory listings the public was given the impression that each Your Host Restaurant was a member of a chain with a single management.

Respondent allocated all of the income and deductions of the 10 corporations operating restaurants and the vending machine corporation to Your Host and the income and deductions of Bakery to Sher-Del. In the alternative, respondent has disallowed the surtax exemptions of every corporation except Your Host and Sher-Del under either section 269 or section 1551. We are to decide whether respondent's determinations are correct.

The facts of this case have many similarities to those of *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073 (1969), affd. 452 F. 2d 137 (C.A. 7, 1971), under which respondent believes his allocations under section 482 can be supported without question. If the present case were the mirror image of *Marc's Big Boy-Prospect, Inc.*—which it is in respondent's view—our task would be much simpler than we now foresee; however, in our view there are several facts which distinguish this case from *Marc's Big Boy-Prospect, Inc.*, and which require a result unlike that of the former case. Accordingly, we shall try to place this case within the proper perspective of section 482 and the pertinent cases which deal with section 482.

Section 482 permits the Secretary or his delegate to allocate income and deductions among two or more organizations owned or controlled by the same interests if he determines that such allocation is necessary to prevent evasion of taxes or clearly to reflect the income of such organization. The Commissioner's authority to allocate, though broad, does not permit him to abuse his discretion or be arbitrary, capricious, or unreasonable. The burden is, however, upon petitioner to show that the Commissioner has overstepped his authority. *Marc's Big Boy-Prospect, Inc., supra; Bush Hog Manufacturing Co.*, 42 T.C. 713 (1964). See particularly *Phillip Brothers Chemicals, Inc. (N.Y.)* v. *Commissioner*, 435 F. 2d 53 (C.A. 2, 1970), which arises in the circuit in which appeal herein would lie. Despite petitioner's burden, if the Commissioner's allocation does not appear reasonable in light of the record, we must conclude that he abused his discretion. *V. H. Monette & Co.*, 45 T.C. 15, 36–37 (1965).

The parties have approached section 482 as if it dealt with several types of prohibited activity; however, our review of the statute and

its legislative and judicial history indicates that section 482 is designed to remedy only one abuse: the shifting of income from one commonly controlled entity to another. *Hamburgers York Road, Inc.*, 41 T.C. 821, 833 (1964); *Ballentine Motor Co.* v. *Commissioner*, 321 F. 2d 796 (C.A. 4, 1963), affirming 39 T.C. 348 (1962); H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16–17, 1939 C.B. (Part 2) 395. Tax-avoidance motives or the lack of a business purpose in forming several corporations are relevant in a section 482 case only to the extent that they prove that there has been an actual shifting of income from one corporation to another. Section 482 is not designed to punish the mere existence of commonly controlled entities nor the unexercised power to shift income among them. *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953); *Bush Hog Manufacturing Co.*, *supra* at 725; *W. Braun Co.* v. *Commissioner*, 396 F. 2d 264 (C.A. 2, 1968). Similarly, if there has been an actual shifting of income, purity of purpose and the presence of sound business reasons for forming multiple corporations are no defense under section 482. In short, section 482 does not deal with motivation and purpose as do section 269 and section 1551 but with economic reality.

Many section 482 cases involve a specific transaction or group of transactions which must be scrutinized for their effect in shifting income from one entity to another; however, it is well settled that the Commissioner can use section 482 to allocate all of the income and deductions of one entity to another where the economic realities so warrant. *Hamburgers York Road, Inc.*, *supra; Marc's Big Boy-Prospect, Inc.*, *supra*.

In *Hamburgers York Road, Inc.*, a successful downtown department store decided to establish a suburban branch store; however, instead of operating the store as a branch the suburban store was incorporated with its ownership related to that of the corporation operating the downtown store. On the record in that case we found that the downtown store provided without adequate compensation so many services for the suburban store that were essential to the suburban store's economic viability that the income of the suburban store was in fact earned by the downtown store. 41 T.C. at 835–838.

As we noted previously, the facts in *Marc's Big Boy-Prospect, Inc.*, resemble those of the present case in many ways. In the former case, Wisconsin Big Boy (WBB) acquired the Big Boy restaurant franchise for the State of Wisconsin. Within a few years it set up or acquired from its shareholders several subsidiary corporations to operate restaurants in the Milwaukee area and two corporations to run commissaries. Each of the subsidiaries operated a restaurant under a subfranchise agreement with WBB. The agreement provided that WBB could supply each subfranchisee with supervisory and man-

agement services for a modest sliding-scale percentage-of-profits fee. The subfranchisees also received the right to use the national Big Boy trademark under the agreement. Under the arrangement, WBB was responsible for running the whole restaurant chain. Accordingly, we found that WBB and the Milwaukee area subfranchisees constituted a single integrated business enterprise. This fact along with the fact that there was no economic reason for setting up multiple corporations created a strong inference that the subsidiary corporations were used to syphon off to the subsidiaries income which was earned by WBB. 52 T.C. at 1099. More importantly, WBB was unable to show that the fees that it received from its subsidiaries represented adequate compensation for the services that it rendered the subsidiaries. On these grounds, we held that respondent was not unreasonable in allocating all of the income and deductions of the subsidiaries to WBB.

A large part of our opinion in *Marc's Big Boy* was devoted to detailing the integration of the Milwaukee area Big Boy restaurants as a single business enterprise; however, we believed that it was clear that we were not using section 482 to penalize the petitioners merely for operating a single business through several corporations but to reflect the fact that subsidiaries were being used to distort the amount of income reported by WBB. The operation of a single business through several corporations creates a likelihood that subsidiaries will be used either to permit the parent to evade taxes or to understate its income. We believed that without evidence that the parent and its subsidiaries dealt at arm's length with each other this likelihood formed a reasonable basis for the Commissioner's allocation under section 482. 52 T.C. at 1099. Accordingly, the allocation to WBB was sustained not because there was an integrated business but because there was no proof that WBB and its subsidiaries dealt at arm's length.

With differences that we shall discuss *infra*, the Your Host Restaurants constituted as much of a single integrated business enterprise as did the Milwaukee area Big Boy chain; however, approval of respondent's allocation under section 482 is not ineluctable.

We note that in several respects the restaurant corporations in this case were more viable economically than were the restaurant subsidiaries in *Marc's Big Boy*. All of the corporations paid directly most of their own costs of doing business. These costs included supplies purchased from Sher-Del, utility bills, Federal and State income taxes, social security taxes and income taxes withheld from employees, fire insurance, and license fees. More importantly, each corporation paid the rent for the locations on which it operated restaurants and was solely responsible for it. Your Host did not guarantee payment of the rent for any locations except its own, and landlords were appar-

ently willing to rely upon the financial responsibility and resources of each corporation rather than those of the total enterprise.

We are also convinced that the fact that Your Host obtained master policies for public liability insurance and workmen's compensation for reasons of economy and administrative convenience does not detract from the fact that each corporation paid its appropriate share of the cost of these items. We think that the situation of Your Host with respect to these expenses is different from that of WBB in *Marc's Big Boy*. WBB operated no restaurants of its own and its only activities were related to running the restaurants owned by its subsidiaries. Hence, it would be impossible to distinguish between WBB's obtaining insurance for its subsidiaries and its providing every other management service for them. On the other hand, Your Host operated as many as 15 restaurants of its own. It incurred no expense in obtaining insurance for the other corporations and benefited from the reduced rates which were available when a larger number of restaurants were insured on the same policy.

Each of the corporations in effect paid the salaries for its own nonadministrative employees. Your Host did no more than lend its name to the "Zero balance" account from which these employees were paid. Your Host did not advance its own funds to pay salaries from this account but only contributed the net salary of its own employees as did the other corporations. The service charges by the bank for the "Zero balance" account were apportioned among the corporations along with other administrative expenses.

The main point of contention between the parties is whether the 15 corporations shared the same administrative staff and maintenance crew or whether Your Host provided for a fee administrative and maintenance services. Under either theory respondent contends that the amounts paid by corporations for these services were computed under an arbitrary and ever-changing formula. We think it immaterial that the corporations may have used a different formula in other years because those years are not before us. During the years before us the cost of providing administrative and maintenance services for all corporations was generally apportioned according to gross sales. Respondent did not determine that this method was unreasonable and we believe it to be based reasonably upon economic realities. We also find it reasonable that advertising expenses and the costs attributable to the district supervisors and maintenance men were only apportioned among the corporations which could benefit from these expenditures. In fact, to have apportioned otherwise would have distorted the income of the nonbenefiting corporations.

The only deviations from the allocation based on gross sales involving a corporation whose case is before us are an adjustment for Sher-

Del and the apportionment of the salary paid Durrenberger. The accountant for all of the corporations testified that sales between Sher-Del and its sister corporations did not involve as much administrative effort as did sales to outside customers. Accordingly, he felt that it was necessary to reduce the amount of Sher-Del's gross sales for purposes of making the administrative expense allocation. From his testimony and other evidence in the record we find that the adjustments made were reasonable.

Durrenberger received about 40 percent of his total salary from Sher-Del, a fact which is explained by his background and expertise in the provisions business. The remainder of his salary was contributed by the other corporations. In the case of the restaurant corporations the amount paid appears roughly to reflect the business activity and number of restaurants of each corporation.

In our opinion petitioners have demonstrated that each corporation paid its own way and that they were economically viable business entities. We are convinced that except for *de minimis* items like help-wanted ads Your Host bore no more of the administrative burden for the restaurant chain than could be accounted for by its own sales. Your Host provided no service for the other corporations for which it was not adequately compensated. Accordingly, unless Your Host could have commanded all of the profits of the other restaurant corporations for the use of its trademark and goodwill, we believe that respondent's allocation is unreasonable for failing to allocate any part of the profits to the corporations which earned them through their own efforts and expense. We emphasize again that the purpose of section 482 is not to punish the existence of multiple corporations but to require each corporation to report its true income.

The trademark and goodwill possessed by Your Host differ considerably from those of WBB in *Marc's Big Boy* and of the downtown store corporation in *Hamburgers York Road, Inc.* First, the restaurants operated by Your Host were on the average no older or more well established than those operated by the 10 other restaurant corporations. The restaurants operated by the 10 other corporations did not trade upon goodwill generated by the restaurants run by Your Host; all of the restaurants generated goodwill which was shared by all of them equally. The public did not associate a particular restaurant with the corporation that operated it, and it makes as much sense to assume that the 10 restaurant corporations donated goodwill to Your Host as it does to assume that Your Host donated goodwill to the other 10. Therefore, the situation is obviously different from that which obtained in *Hamburgers York Road, Inc.*, where the success of the suburban store depended largely upon the public's belief that it was a branch of the old and respected downtown store. Second, we

believe that the Your Host trademark had little value in addition to the goodwill generated from the operation of the restaurants themselves. The Your Host trademark cannot be compared to the Big Boy trademark in Marc's Big Boy which was used nationally and which permitted the Milwaukee area restaurants to benefit from the goodwill generated by others across the country. Although Your Host owned the trademark, the concept of Your Host Restaurants really belonged to Wesson and Durrenberger who could donate their idea to their corporations. Without doubt there was an advantage to being a Your Host Restaurant rather than another short-order cafe; however, we feel that this advantage flowed primarily from the local advertising and management shared by all of the corporations. We have already determined that the corporations divided up these items equitably. The near failure of the Rochester Your Host Restaurants, which had absentee management problems, indicated that without the concentrated local advertising and local management the Your Host name was not worth a great deal.

We hold in light of the record in this case that the 10 restaurant corporations were viable economic entities which earned their own income and that Your Host provided no service or benefit to these 10 corporations for which it was not adequately compensated. Accordingly, we hold that respondent may not allocate to Your Host, Inc., all of the income and deductions of the 10 restaurant corporations for the years in issue.[4]

While we believe that the 10 restaurant corporations were economically viable, this opinion does not hold true in the cases of Chef, the vending machine corporation, and Bakery.

All of Chef's income was derived from renting refrigeration and storage facilities to Sher-Del and from operating vending machines which were located solely in Your Host Restaurants. There is nothing in the record which indicates whether the terms upon which Chef dealt with its parent, Sher-Del, or its sister corporations were fair and reasonable. Chef, in substance, conducted no business; therefore, it was reasonable for respondent to determine that it did not earn its income. Accordingly, we hold that respondent did not abuse his discretion in allocating all of Chef's income and deductions to Your Host under section 482.

We view the operations of Bakery in a similar light. Bakery only sold its products to Sher-Del; it could hardly be considered to have

---

[4] The parties have proceeded upon an all-or-nothing approach with respect to sec. 482. A partial allocation under sec. 482 was not among the several alternative resolutions of this case presented by the parties. Accordingly, we do not think that a partial allocation, the basis of which is not readily apparent from record, would be appropriate in this case. Cf. *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073 at 1105–1106 ; *Helvering* v. *Taylor*, 293 U.S. 507 (1935).

conducted any business. In addition, Sher-Del paid Bakery the same prices for its products as Sher-Del charged the restaurants. This arrangement garnered for Bakery all of the profit from the manufacture and sale of baked goods. We believe that respondent proceeded upon a reasonable basis in allocating all of Bakery's income and deductions to Sher-Del under section 482 and uphold his determination.

Although we have found that the 10 restaurant corporations earned their own income and reported it correctly for purposes of section 482, it does not follow that every one of this host of corporations is entitled to the surtax exemption provided by section 11(d). Respondent contends that the principal purpose for forming the 10 restaurant corporations was to obtain additional surtax exemptions and that section 269(a) is applicable to disallow these benefits. We agree with respondent with respect to 309 Delaware, Royal, Main, Telesnax, and Alro only.

Section 269 provides the following in part:

SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.
  (a) IN GENERAL.—If—
    (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
    (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,
and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

It is well established that the formation of a new corporation is an acquisition for purposes of section 269. *James Realty Co.* v. *United States*, 280 F. 2d 394 (C.A. 8, 1960). We have also held that section 269 applies to an acquired corporation as well as an acquiring corporation. *Concord Supply Corporation*, 37 T.C. 919 (1962). On the facts in this case there is no dispute that the requisite control is present. Accordingly, the only question remaining under section 269 is whether the corporations were formed for tax-avoidance purposes.

Respondent has pointed to several facts as ruling out all non-tax-avoidance purposes for forming the 10 corporations. These facts include the integration of the 10 corporations into a single business, the thin capitalization of the corporations, and the frequent interest-free loans and advances among the corporations which were not evidenced by notes. In addition, respondent finds no business reason in his view of the record which justifies the existence of more than one

corporation. *Concord Supply Corporation*, *supra; Joe (Joseph) Dillier*, 41 T.C. 762 (1964), affirmed sub nom. *Made Rite Investment Co.* v. *Commissioner*, 357 F. 2d 647 (C.A. 9, 1966). Petitioner, on the other hand, has attempted to show the economic reasons underlying the formation of each corporation. *Southeastern Canteen Co.* v. *Commissioner*, 410 F. 2d 615 (C.A. 6, 1969), certiorari denied 396 U.S. 833 (1969).

We believe that the facts noted by respondent are strong circumstantial evidence that tax avoidance was a principal purpose in the formation of the 10 corporations. We also tend to discount petitioner's claim that the corporations were set up solely on the advice of their attorney who was an expert in real estate matters without any knowledge of taxation. The benefit of multiple surtax exemptions is, we believe, as obvious to a layman as it is to a tax expert.

Throughout the trial and on brief petitioners have complained that their burden of proof under section 269 is impossible because the corporations were formed from 13 to 22 years before trial and because the principals involved in developing the Your Host Restaurant chain were either dead or unavailable for trial. We sympathize with petitioners and have allowed them great latitude in submitting evidence concerning the formation of the restaurant corporations. We also note that respondent's ability to rebut evidence of purpose has not improved with the passage of time. More importantly, the existence of a principal non-tax-avoidance purpose for forming the corporations can better be proven with evidence of objective facts rather than with subjective evidence of intent provided by the principals. *Bobsee Corporation* v. *United States*, 411 F. 2d 231 (C.A. 5, 1969). Petitioners have brought forth such evidence in the cases of Boulevard, Niagara, Transit, and Sharlem (the shopping plaza corporations) and in the cases of Utica and Rochester .

We believe that the risks involved in the mid-1950's in opening up restaurants in the emerging new suburban shopping plazas on long-term leases justified the formation of separate corporations. The chance of failure in these locations was substantial and formed the principal motivation for the formation of Boulevard, Niagara, Transit, and Sharlem. The first of these corporations, Boulevard, was formed in 1953 and the last, Sharlem, in 1956 before it became apparent that the shopping plazas were desirable locations. We must lend credence to petitioners' contention that the riskiness of being a pioneer in shopping plaza development was the primary purpose for the formation of the four corporations because following the success of the first plaza locations additional plaza locations were opened without the use of additional corporations.

Utica was formed in 1954 to operate a restaurant in a location upon which a former restaurant proprietor had failed. The restaurant was also in a neighborhood which the partners felt was incompatible with the kind of people who patronized Your Host Restaurants. We believe that the previous record of failure and the problems in the neighborhood in which the restaurant was to be located were the principle factors which motivated the partners to form Utica.

Rochester was incorporated in 1956 to begin developing a chain of Your Host Restaurants in the Rochester area. The problems involved in operating restaurants 70 miles distant from Your Host's normal base of operations were in our opinion substantial. The partner's principal purpose in forming Rochester was to protect their enterprise from the significant risk of losses from the Rochester operation. The partners' fears about the potential for failure in Rochester turned out to be justified in fact as two of the three restaurants opened there failed while the third is barely profitable.

We have examined the reasons offered by petitioners for the formation of the other four restaurant corporations and have found them to be either fantastic or merely unsupportable upon the record. We have set forth these reasons in detail in the Findings of Fact. Quite predictably petitioners have argued that the partners wished to limit their liability when opening up new locations even when there was no particular reason for believing that the new location would be unsuccessful. Petitioners have also claimed that several of the corporations were necessary to protect the various Host names from appropriation. Because the creation of any corporation will provide its shareholders with limited liability and prevent another corporation from getting a charter under the same name, we cannot take these arguments too seriously unless there is additional evidence showing the need for multiple corporations.

In light of the strong circumstantial evidence of intent to evade taxes provided by the existence of an integrated business, the thin-capital structure and intercorporate borrowing, and the absence of believable business reasons for their formation, we find that the principal purpose for the formation of 309 Delaware, Royal, Main, and Telesnax was tax avoidance. Similarly, there is no reason evident upon the record other than tax avoidance that explains the formation of the real estate holding company, Alro, in 1951. Therefore, we find that the principal purpose for the partners' creation of Alro was tax avoidance.

Accordingly, we hold that respondent was correct in disallowing the surtax exemptions of 309 Delaware, Royal, Main, Telesnax, and Alro.

In the light of the foregoing,

> *Decisions will be entered for the respondent in docket Nos. 2675–69, 461–70, 1207–71, 2678–69, 450–70, 1199–71, 2681–69, 453–70, 1201–71, 2683–69, 455–70, 1203–71, 2684–69, 456–70, and 1206–71.*
>
> *Decisions will be entered for the petitioners in docket Nos. 2676–69, 448–70, 1197–71, 2679–69, 451–70, 1200–71, 2680–69, 452–70, 2682–69, 454–70, 1202–71, 2685–69, 457–70, 1205–71, 2686–69, 458–70, and 1204–71.*
>
> *Decisions will be entered under Rule 50 in docket Nos. 2673–69, 446–70, 1194–71, 2687–69, 459–70, 1195–71, 2677–69, 449–70, 1198–71, 2688–69, 460–70, and 1196–71.*