GEORGE POWERS and WEETA POWERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Powers v. Commissioner
Docket No. 8716-79.
United States Tax Court
T.C. Memo 1982-567; 1982 Tax Ct. Memo LEXIS 180; 44 T.C.M. (CCH) 1265; T.C.M. (RIA) 82567; September 28, 1982. Walter J. Lynwood and Louis Vago, for the petitioners. Judy Jacobs, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the following years: Year
Deficiency
1970 [1]
$1,306
1973
7,541
1974
10,771
1975
16,854
*181 In an amendment to his answer, respondent redetermined the deficiencies in taxes for 1973 and 1974 as $12.026 and $22,729, respectively. After concessions, the sole issue for decision is whether petitioners' transactions with Marineland Corporation and LSD Corporation were not at arm's length, necessitating an allocation of income to petitioner under section 482. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. George Powers (hereinafter petitioner) and Weeta Powers, husband and wife, resided in Streator, Illinois, when they filed their 1973, 1974, and 1975 joint Federal income tax returns and when they filed their petition in this case. Marineland Lease
From at least 1965 until 1978, petitioner owned a controlling interest in Marineland Corporation (hereinafter Marineland). During the yers in issue, Marineland owned approximately 72 acres of real estate in La Salle County, Illinois, approximately 13 acres of which comprised a marina known *182 as Starved Rock Marina (hereinafter "the marina"). On November 1, 1965, Marineland leased the marina to petitioner for an initial term of 10 years. The lease was amended several times between 1968 and 1974. The amendments, inter alia, provided for periodic increases in rent and obligated petitioner to pay real estate taxes on the marina property. During the years in issue, Marineland's sole business was leasing real estate to petitioner. Such real estate consisted of land and various improvements made to the property by Marineland. The following schedules list the improvements owned and leased by Marineland in 1973, 1974, and 1975, showing their date of acquisition, original cost, accumulated depreciation, and remaining undepreciated cost: 1973
Date of
Original
Depreciation
Remaining
Asset Group
Acquisition
Cost
as of 1/1/73
Undepreciated Cost
Land improvements
$122,232
$122,232
Buildings
1962-1972
185,972
$80,936
105,036
Mar. 1973
7,529
7,529
Machinery & Equipment
1962
371
203
168
1974
Date of
Original
Depreciation
Remaining
Asset Group
Acquisition
Cost
as of 1/1/74
Undepreciated Cost
Land improvements
$122,232
$122,232
Buildings
1962-1972
185,972
$91,657
94,315
Mar. 1973
7,529
282
7,247
June 1974
6,882
6,882
Machinery & Equipment
1962
371
220
151
*183 1975
Date of
Original
Depreciation
Remaining
Asset Group
Acquisition
Cost
as of 1/1/75
Undepreciated Cost
Land improvements
$122,232
$122,232
Buildings
1962-1972
185,972
$100,338
85,634
Mar. 1973
7,529
659
6,870
June 1974
6,882
172
6,710
June 1975
80,494
80,494
Machinery & Equipment
1962
371
316
55
June 1975
10,248
10,248
LSD Lease
In 1967, petitioner formed an Illinois corporation known as Starved Rock Marina Launching, Storage and Docking Corporation (hereinafter LSD). Since that time he has owned a controlling interest in LSD. Petitioner formed LSD to operate the marina, so, in 1967, he subleased to it all of the improved real estate leased to him from Marineland, except for approximately 5,000 square feet of one 12,300 square foot building. [3] Petitioner used that 5,000 square feet for a new boat sales business which he operated as a sole proprietorship during the years in issue. *184 During 1972, 1973, and 1974, LSD used the subleased property to operate the marina, which rented, launched, stored, docked, and serviced boats for the general public. In September of 1972, LSD also began operating a restaurant and clothing store at the marina in a new building built by Marineland. An addition to the restaurant and clothing store building was completed around June of 1975. From 1969 through 1975, petitioner added various improvements to the property he leased from Marineland. Petitioner claimed depreciation deductions for those improvements on his 1973, 1974, and 1975 Federal income tax returns. Approximately 90 percent of the improvements was used by LSD in its operation of the marina; the remaining 10 percent was used by petitioner in his boat sales business. The schedules below list the improvements owned by petitioner in 1973, 1974, and 1975, and detail their date of acquisition, original cost, accumulated depreciation, and remaining undepreciated cost: 1973
Date of
Original
Depreciation
Remaining
Asset Group
Acquisition
Cost
as of 1/1/73
Undepreciated
Cost
Machinery & Equipment
1969-1972
$19,374
$7,169
$12,205
2/1/73
195
195
Furniture & Fixtures
1969-1972
37,141
10,792
26,349
June 1973
15,526
15,526
Leasehold improvements
1969-1972
204,834
90,361
114,473
June 1973
38,450
38,450
Auto & Trucks
Prior to 1972
16,453
11,109
5,344
1972
3,600
905
2,695
Mar. 1973
6,753
6,753
*185 1974
Date of
Original
Depreciation
Remaining
Asset Group
Acquisition
Cost
as of 1/1/74
Undepreciated
Cost
Machinery & Equipment
1969-1972
$19,374
$9,130
$10,244
2/1/73
195
10
185
Furniture & Fixtures
1969-1972
37,141
15,490
21,651
June 1973
15,526
970
14,556
June 1974
12,949
12,949
Leasehold improvements
1969-1972
204,834
114,837
89,997
June 1973
38,450
932
37,518
June 1974
14,559
14,559
Auto & Trucks
Prior to 1972
16,453
15,047
1,406
1972
3,600
2,105
1,495
Mar. 1973
6,753
2,532
4,221
1975
Date of
Original
Depreciation
Remaining
Asset Group
Acquisition
Cost
as of 1/1/75
Undepreciated
Cost
Machinery & Equipment
1969-1972
$19,374
$11,091
$8,283
2/1/73
195
34
161
Furniture & Fixtures
1969-1972
37,141
20,187
16,954
June 1973
15,526
2,824
12,702
June 1974
12,949
1,619
11,330
Leasehold improvements
1969-1972
204,834
134,237
70,597
June 1973
38,450
2,796
35,654
June 1974
14,559
705
13,854
12/31/74
16,763
16,763
1/1/75
855
855
2/1/75
461
461
3/1/75
1,898
1,898
4/1/75
4,890
4,890
7/1/75
46,735
46,735
9/1/75
2,842
2,842
11/1/75
850
850
12/1/75
2,737
2,737
Auto & Trucks
Prior to 1972
16,453
15,753
700
1972
3,600
3,305
295
Mar. 1973
6,753
4,643
2,110
*186 Notice of Deficiency and Amended Answer
On Schedules C of his 1973, 1974, and 1975 Federal income tax returns, petitioner claimed deductions for rents paid to Marineland and included in gross receipts rents received from LSD as follows: Rent Paid to
Rent Received
Year
Marineland
from LSD
1973
$36,845
$35,543
1974
33,260
44,755
1975
58,500
40,100
On those returns, petitioner also claimed deductions for Marineland's real estate taxes, which he paid pursuant to the 1973 amended lease agreement: Year
Taxes Paid
1973
$5,325
1974
9,252
1975
3,199
In the notice of deficiency, respondent determined that petitioner's sublease with LSD was not an arm's-length transaction and under section 482 allocated additional rental income to petitioner of $29,458, $13,574, and $37,516 for 1973, 1974, and 1975, respectively. Additionally, respondent disallowed the deductions claimed by petitioner for Marineland's real estate taxes paid by him in 1973, 1974, and 1975. In an amended answer, respondent determined that both the lease from Marineland to petitioner and the sublease from petitioner to LSD were not arm's-length transactions and, *187 therefore, a section 482 allocation is necessary to clearly reflect the income of petitioner, Marineland, and LSD. [4] On brief, respondent restated his allocations to petitioner's income as $21,081, $12,212, and $38,047 for 1973, 1974, and 1975, respectively. [5] Using 10 percent of cost less depreciation as the fair rental value of the improvements leased by Marineland to petitioner, plus the fair rental value of the land as determined by petitioner's expert witness C. William Shonkwiler, respondent reduced the rents paid to Marineland by petitioner as follows: Marineland
Rent Paid [6]
Rent Allowed
Year
By Petitioner
by Respondent
1973
$36,845
$32,758
1974
33,260
33,238
1975
58,500
38,237
*188 To obtain a fair rental value of the property subleased to LSD, respondent first calculated 10 percent of the depreciated cost of the improvements petitioner placed on the marina. He reduced this amount by 10 percent to take out the fair rnetal value of the improvements petitioner used in his boat sales business. To this figure, respondent added the fair rental value of the marina as previously calculated, less the rental value of the 5,000 square feet of building (again, as determined by Mr. Shonkwiler) used by petitioner in his business. Respondent thus increased the rents petitioner received from LSD as follows: LSD
Rent Received
Rent Allowed
Year
By Petitioner
By Respondent
1973
$35,543
$47,212
1974
44,755
47,693
1975
40,100
54,685
The following schedule summarizes respondent's section 482 adjustments to petitioner's income: Respondent's Section 482 Adjustments Summarized
Marineland Lease
1973
1974
1975
Rent paid by petitioner
$36,845 33,260 $58,500 FRV of marina property
leased to petitioner
32,758 33,238 38,237 Excess rent paid to Marineland
4,087 22 20,263 Real estate taxes
5,325 9,252 3,199 Total excess rent paid to
Marineland
9,412 9,274 23,462 LSD Lease
FRV of marina property
subleased to LSD
$32,758 $33,238 $38,237 Less portion used by petitioner
(2,943)
(3,098)
(3,407)
29,815 30,140 34,830 FRV of improvements leased
to LSD
17,397 17,552 19,855 Total
47,212 47,692 54,685 Rent received from LSD
35,543 44,755 40,100 Total underpayment by LSD
11,669 2,937 14,585 Total sec. 482 adjustment
21,081 12,211 38,047 *189 OPINION We must determine whether pursuant to section 482, respondent may allocate income to petitioner from Marineland and LSD by adjusting petitioner's payments and receipts of rent. [7]
Section 482 provides: In amy case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses. Section 482 was enacted to prevent two or more related businesses from arbitrarily shifting income between or *190 among themselves. Murphy v. Commissioner,231 F. 2d 639 (6th Cir. 1956); Brittingham v. Commissioner,66 T.C. 373 (1976), affd. 598 F. 2d 1375 (5th Cir. 1979); Huber Homes, Inc. v. Commissioner,55 T.C. 598 (1971). Its purpose is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer; hence the standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Section 1.482-1(b)(1), Income Tax Regs.Section 482 vests the Commissioner with broad discretion, and his determinations in applying such section must be upheld unless the taxpayer establishes that such determinations are unreasonable, arbitrary, or capricious. Baldwin-Lima-Hamilton Corp. v. United States,435 F. 2d 182, 185 (7th Cir. 1970); Philipp Brothers Chemicals, Inc. (N.Y.) v. Commissioner,435 F. 2d 53, 57 (2d Cir. 1970), affg. 52 T.C. 240 (1969); Ach v. Commissioner,358 F. 2d 342 (6th Cir. 1966), *191 affg. 42 T.C. 114 (1964). Section 1.482-2(c)(1), Income Tax Regs., deals specifically with the "use of tangible property" and empowers the Commissioner to allocate rental income as follows: Where possession, use, or occupancy of tangible property owned or leased by one member of a group of controlled entities * * * is transferred by lease or other arrangement to another member of such group * * * at a charge which is not equal to an arm's length rental charge * * * the * * * [Commissioner] may make appropriate allocations to properly reflect such arm's length charge. Focusing on the standard of an arm's-length charge as required by the statute and regulations, petitioner argues that the rentals he received from LSD from the sublease of the marina were equal to the fair rental value of such property and were, therefore, the equivalent of an arm's-length charge. Petitioner also argues that respondent's allocations are arbitrary and unreasonable because they are based in part upon calculations which include $122,232 of nonexistent assets. Finally, *192 petitioner maintains that the transactions in question were carried on for valid business reasons and were not shams, and thus section 482 is inapplicable. Respondent, on the other hand, contends that the leasing transactions between Marineland and petitioner, and petitioner and LSD were not carried on at arm's length. We agree with respondent for the reasons set out below. Petitioner had the following rent expense and income for the years 1973, 1974, and 1975: Rent Paid
Rent Received
Year
to Marineland
from LSD
1973
$36,845
$35,543
1974
33,260
44,755
1975
58,500
40,100
Petitioner leased approximately 13 acres of land and improvements from Marineland. He then subleased virtually all of this property, [8] plus improvements and some of his own assets to LSD. However, as can be seen from the above table, the rent petitioner received from LSD was in two of the three years at issue less than the rent petitioner paid to Marineland. Obviously, either the rent paid to Marineland was excessive, or the rent paid by LSD was less than the property's fair rental value. *193 Petitioner contends that the transactions between him and LSD were arm's-length transactions because LSD could not afford to pay any more rent than it did. The regulations under section 482 provide a definition of an arm's-length charge (for property leased by an owner or user not in the business of renting property) [9] based on a formula taking into account what is essentially depreciation, a charge similar to interest, and certain expenses and deductions for the property. Section 1.482-2(c)(2), Income Tax Regs. There is no limitation on this amount imposed by the lessee's ability to pay. Petitioner argues that the fact that the lease actually called for more rent than was paid by LSD shows the transactions were at arm's length in that petitioner was trying to get the maximum rents obtainable. We believe, however, that this fact supports respondent's position that the transactions at issue were not carried on as they would have been between petitioner and an unrelated third party. Certainly, had an uncontrolled lessee consistently defaulted on a portion of *194 its rental payments, petitioner would have looked elsewhere for a tenant better able to pay the rents provided for in its lease. Petitioner has also attempted to refute respondent's determination by introducing into evidence two prior leases of the marina to unrelated third parties at amounts lower than those received from LSD. We have carefully examined the two prior leases and find them to be unpersuasive. The prior leases, executed 9 and 10 years before the first of the years here in issue, encompassed different areas on different terms than the lease between petitioner and LSD, and are thus not relevant to our determination of a fair rental value. Petitioner takes the position that he has introduced evidence that *195 the rentals charged were fair and reasonable and that such evidence is uncontroverted and unimpeached, and therefore should be accepted. Petitioner's evidence consisted of the testimony of two witnesses offered as experts. Each of these witnesses stated that in his opinion the rentals paid by LSD exceeded the fair rental value of the leased property. [10] Petitioner's first expert witness, C. William Shonkwiler (hereinafter Shonkwiler), testified that he used the comparative, or market data, approach, in determining the fair rental value of the land itself. He placed the value at $9,450 in 1973, $10,500 in 1974, and $11,550 in 1975. He explained further that, being unable to find any comparable rented property in the area, he used the investor's approach to value the improvements. Shonkwiler defined this approach as one in which the appraiser assumes an investor would want the most profitable likely use to which a property can be put and the highest net return on his investment. Shonkwiler believed that an investor would normally expect a net return of 10 percent of the fair market value, or cost less depreciation, of the leased improvements. *196 The other expert witness offered by petitioner, Charles H. Stokes (hereinafter Stokes), had no reasonable foundation for his opinion as to a fair rental value. Although Stokes had been a marina consultant for many years, upon cross-examination it became apparent that he had little or no experience in appraising. He valued the property on the basis of the marina's sales volume and what he personally would be willing to pay to rent the marina; yet he only had a limited knowledge of the property and improvements involved. Stokes was unable to give the acreage of the marina property, and he did not know the age, cost, or construction material of the buildings involved. Moreover, he indicated in his report two allegedly comparable marinas which supported his valuations. A close examination of those marinas reveals neither one is comparable. After reviewing the testimony of the two expert witnesses, we believe Shonkwiler rendered a more accurate estimate of the value of the marina property. Shonkwiler was an experienced real estate appraiser, and he used appraisal methods which we believe to be fair and reasonable. [11] However, the record reveals that he neglected to include in *197 his appraisal many of the improvements and assets placed on the land by Marineland and petitioner. Inasmuch as respondent has agreed Shonkwiler's appraisal methods are reasonable, and has used those methods in recomputing petitioner's tax deficiencies, we sustain respondent's formulation of fair rental values for the marina and improvements. Petitioner argues that it is unfair for us to consider Marineland because the statute of limitations bars Marineland from claiming a refund, and Marineland was liquidated and is no longer even in existence. We agree with respondent that the Marineland transactions are an integral part of this case. Moreover, respondent has conceded in his reply brief that if we determine the rent paid by petitioner to Marineland is excessive, then he will in the Rule 155 computation reduce petitioner's tax liability by the amount of any refund to which Marineland would be entitled. Petitioner argues further *198 that respondent's allocations are arbitrary and unreasonable because they are based in part upon calculations which include $122,232 of "mythical assets." These assets are mentioned on Marineland's depreciation schedule worksheet as merely "Land Improvements" costing $122,232. No date of acquisition is listed, and no depreciation for those improvements is claimed on that schedule or on Marineland's income tax returns.The improvements are not listed as assets on the Schedules L (Balance Sheets) of Marineland's tax returns, nor are they included in Marineland's assets as set out in paragraph 6 of the parties' stipulation of facts. However, petitioner himself testified to the existence of those improvements and the approximate cost thereof, and several of the stipulated exhibits describe the improvements. While we will not lightly disregard facts to which the parties have stipulated, (Rule 91(e); Mifflin v. Commissioner,24 T.C. 973 (1955)), because petitioner's own testimony is contrary to paragraph 6, and because the stipulation of facts is itself internally inconsistent, we must look to the record as a whole. We are convinced such improvements do in fact exist *199 and respondent's computation is therefore correct. Even were we to decide otherwise, as we have already determined the Marineland transactions are properly at issue, the same result obtains due to the correlative adjustment to Marineland's income: Respondent's Section 482 Adjustments
1973
1974
1975
Total
Total Sec. 482 adjustment
$21,081
$12,211
$38,047
$71,339
428 ADJUSTMENTS EXCLUDING $122,232 LAND IMPROVEMENTS
MARINELAND LEASE
1973
1974
1975
Total
Rent paid by petitioner
$36,845 $33,260 $58,500 FRV of marina property leased
to petitioner
* 20,535 21,015 26,014 Excess rent paid to Marineland
16,310 12,245 32,486 Real estate taxes
5,325 9,252 3,199 Total excess rent paid to
Marineland
21,635 21,497 35,685 78,817 LSD LEASE
FRV of Marina property subleased
to LSD
* 20,535 21,015 26,014 Less portion used by petitioner
(2,943)
(3,098)
(3,407)
17,592 17,917 22,607 FRV of improvements leased
to LSD
17,397 17,552 19,855 Total
34,989 35,469 42,462 Rent received from LSD
35,543 44,755 40,100 Total underpayment by LSD
( 554)
(9,286)
2,362 (7,478)
Total Sec. 482 adjustment
21,081 12,211 38,047 71,339 *200 Petitioner alleges the excess rent paid to Marineland was attributable to the rest of the 72 acres Marineland owned and leased to petitioner but which petitioner did not sublease to LSD. He argues that respondent introduced no evidence to prove the value of those acres and thus failed to carry his burden of proof under Rule 142(a). This appears to us as a last-ditch argument formulated some time after the trial of this case. Petitioner's testimony and the lease agreements in evidence clearly show that Marineland leased petitioner only the 13 acres of marina property, and that petitioner subleased to LSD everything that he had leased from Marineland, except the 5,000 square feet of one building. Finally, petitioner maintains that he had valid business purposes for arranging the leases as he did and thus the transactions were not shams. Respondent has never attacked the structure of the transactions, and his authority is not so limited. Section 1.482-1(c), Income Tax Regs., states: In determining the true taxable income *201 of a controlled taxpayer, the * * * [Commissioner] is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. See Dillard-Waltermire, Inc. v. Campbell,255 F. 2d 433, 436 (5th Cir. 1958); Eli Lilly and Co. v. United States,178 Ct. Cl. 666, 671-681, 372 F. 2d 990, 999 (1967); Your Host, Inc. v. Commissioner,58 T.C. 10, 24 (1972), affd. 489 F. 2d 957 (2d Cir. 1973). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The deficiency determined for the 1970 taxable year resulted from the disallowance of a $1,306 refund from a tentative investment credit carryback from 1973 to 1970.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The original sublease was amended in 1967, 1968, 1969, 1973, and 1974. The amendments correlated with those made to the lease between petitioner and Marineland, i.e., they provided for periodic increases in rent and obligation LSD to pay real estate taxes on the marina.↩
4. In a second amended answer respondent alternatively contended that a sec. 482↩ allocation was necessary based on depreciation, as petitioner was depreciating that portion of the improvements not used in his boat sales business but leased to LSD. Respondent allocated additional income to petitioner of $43,394, $38,077, and $28,836 for 1973, 1974, and 1975, respectively. 5. While respondent's allocation for 1975 is greater than those contained in either the notice of deficiency or the second amended answer, respondent has not alleged a correspondingly greater deficiency for that year.↩
6. These amounts do not include the real estate taxes paid by petitioner for Marineland.↩
7. On brief, respondent abandoned his alternate issue with respect to a section 482↩ allocation based on depreciation, and thus we will not conside it.
8. Petitioner subleased to LSD all of the marina property except 5,000 square feet of one building. The fair rental value of this 5,000 square feet is minimal: petitioner's expert Shonkwiler testified that he would value it at $2,943 in 1973, $3,098 in 1974, and $3,407 in 1975.↩
9. Sec. 1.482-2(c)(2)(i), Income Tax Regs.↩, states in part: "[A]n owner or user shall be considered to be in the trade or business of renting property if it engages in the trade or business of renting property of the same general type as the property in question to unrelated parties." There is no evidence in the record indicating that petitioner is in the trade or business of renting marinas during the taxable years in question.
10. Apparently, because respondent has the burden of proof with respect to the Marineland lease (Rule 142(a)), and because petitioner objected to the amended answer putting such lease in issue, petitioner offered no expert testimony on this point.↩
11. We approved a method similar to Shonkwiler's investor's approach in Clairton Slag, Inc. v. Commissioner,T.C. Memo. 1979-485↩ (9.5 percent of fair market value equals a fair rental value for purpose of sec. 162(a)(3) deduction).
*. FRV of marina property leased to petitioner per respondent's adjustments less FRV (10%) of $122,232 land improvements.↩